135 F.3d 1105
 Ruth Ann WILLIAMS, Personal Representative of the Estate of
Anthony Wade, Deceased, Plaintiff-Appellee,
v.
T.N. MEHRA; Dr. Cabrera; Dr. Rodriguez, Defendants-Appellants,
John Jabe, Warden; Gerald Hofbauer, Deputy Warden; John
Fisher, Security Guard; Jane Doe, Nurse, Defendants.
 No. 97-1118.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 20, 1997.
Decided Feb. 5, 1998.
 
 James W. McGinnis (argued and briefed), Detroit, MI, for Appellee.
 E. Michael Stafford, Asst. Attorney Gen., Office of the Attorney General, Corrections Division, for Defendants.
 Erica Weiss Marsden (argued and briefed), Office of the Attorney General of Michigan, Mental Health Division, Lansing, MI, for Defendants-Appellants.
 Before: KEITH, BOGGS, and COLE, Circuit Judges.
 KEITH, J., delivered the opinion of the court, in which COLE, J., joined. BOGGS, J. (pp. 1116-22), delivered a separate opinion concurring in part and dissenting in part.
 OPINION
 KEITH, Circuit Judge.
 
 
 1
 Defendants-Appellants, Dr. Mehra, Dr. Cabrera, and Dr. Rodriguez, appeal the district court's denial of summary judgment on the grounds of qualified immunity on Plaintiff's Eighth Amendment claim of deliberate indifference brought pursuant to 42 U.S.C. § 1983. For the reasons stated herein, we AFFIRM in part and REVERSE in part the decision of the district court.
 
 I. Factual Background
 
 2
 Plaintiff, Ruth Ann Williams, is the personal representative of the estate of decedent, Anthony Wade. Decedent committed suicide while incarcerated at the State Prison of Southern Michigan (hereinafter "SPSM"). Defendants-Appellants, Mehra, Cabrera, and Rodriguez, are psychiatrists for SPSM, and each evaluated decedent prior to his death. The relevant facts are as follows.
 
 
 3
 Decedent was convicted of second degree murder and conspiracy to commit murder on August 4, 1993. Decedent was sentenced to serve a 25-60 year prison term. Prior to decedent's commitment to SPSM, decedent was a pre-trial detainee in Wayne County Jail (hereinafter "WCJ"), from April 24, 1992 to August 20, 1993. During decedent's detainment in WCJ, he was diagnosed as suffering from clinical depression with psychotic features. Decedent remained in the WCJ's medical ward and received various forms of psychotherapy treatments. At various times throughout decedent's incarceration, decedent stated that he was depressed and that he heard voices. On several occasions decedent wavered about whether he wanted to end his life--stating that he did not want to live anymore, that he thought about suicide, that he was tired, and that he was in jail for something he did not do. Yet, when questioned as to whether decedent had suicidal ideation, decedent denied that he would actually take his life.
 
 
 4
 To counteract the voices in decedent's head, decedent was prescribed the psychotropic medication, Thorazine, which is used to manage manifestation of psychotic disorders. In December 1992, decedent attempted suicide by overdosing on twenty of the Thorazine tablets. Decedent had hoarded the pills for his suicide attempt. Decedent was thereafter taken off the tablets, placed on liquid psychotropic medication, and provided additional therapy sessions. Nevertheless, decedent's condition worsened, and on February 18, 1993, he was transferred to Northville Regional Psychiatric Hospital (hereinafter "Northville").
 
 
 5
 Initial diagnosis at Northville revealed that decedent was severely depressed with suicidal thoughts. Decedent had a poor appetite, a sleep disorder, low energy, and a poor libido. Doctors prescribed the anti-depressant, Sinequan, in liquid form and administered individual and group psychotherapy. Decedent's condition marginally improved. Decedent continued to suffer from major depression, yet, he denied having any suicidal thoughts or hallucinations. Decedent did, however, verbalize that he planned to overdose on pills when given the opportunity. Decedent was continued on Sinequan liquid 225mg, and Lithium citrate 300 mg to counteract the depression.
 
 
 6
 Decedent's prognosis at the time of discharge was reflected as, "poor to guarded for patient to be maintained in the Wayne County Jail. Major risk factor for this patient is non-compliance with discharge medication and/or patient's condition deteriorating in response to the stress of being incarcerated in the Wayne County Jail and facing his legal problems."[1]
 
 
 7
 Upon return to WCJ, decedent was maintained on the same liquid medication and received psychiatric intervention at least once a week. On August 20, 1993, decedent was transferred from WCJ to SPSM to begin his sentence term for the convictions. During decedent's final interview at WCJ, decedent admitted to medical personnel that he had repeated thoughts of suicide and that he had a suicide plan but refused to share it with anyone. This information was duly noted in decedent's discharge summary.
 
 
 8
 Although it is disputed as to what information was available to Defendants upon decedent's arrival at SPSM, it is undisputed that the following items were available: 1) the Pre-Sentence Investigation Report, 2) the Wayne County Discharge Planning-Referral Form, and 3) the Sheriff's Questionnaire.
 
 
 9
 The Pre-Sentence Investigation Report, in addition to stating that decedent had psychiatric problems, included the following:
 
 
 10
 While in WCJ, the defendant attempted suicide one week prior to Christmas, by taking 20 Thorazine tablets. He states that he did so, because he is locked up for something that he did not do. He further stated that he still thinks about suicide on occasion. He said, "I still think of suicide on occasion. I am going to prison for something I didn't do. I was trying to keep from killing the girl.
 
 
 11
 The Wayne County Discharge Planning-Referral Form stated that decedent was diagnosed as suffering from "[m]ajor depression 296.3 with psychotic features." It also stated that decedent's current medications were "Sinequan 200 m.g. (conc)," "Lithium Citrate;" and "Prolixin HCL."[2]
 
 
 12
 The Discharge Planning-Referral Form also stated that decedent had repeated suicide thoughts and that decedent stated that he "may as well wait until after sentencing on Thursday."[3] The form further stated, "[i]nmate reports [of] a plan but refuses to share with therapist."
 
 
 13
 The Sheriff's Report was devoid of any information.
 
 
 14
 On August 20, 1993, the same day of decedent's transfer to SPSM, decedent was seen by Nurse Keller. Decedent completed a health form stating that he heard voices and that he was currently taking Thorazine. Keller called WCJ to verify decedent's medication; however, she was informed that decedent was taking Sinequan at bedtime. Keller noted this information in decedent's file.
 
 
 15
 On August 25, 1994, decedent was seen by psychologist, Harold Duckworth. A written psychological test indicated that decedent was suffering from depression. Duckworth's report indicated that decedent had no psychiatric history or suicide ideation attempts. No follow-up action was recommended.
 
 
 16
 On August 30, 1993, another psychologist, Marie Alcala-Cardew, interviewed decedent because his psychological screening tests had been red-flagged. Cardew's report, dictated September 2, 1993, indicated:
 
 
 17
 [decedent's] psychological history consists of his being treated for depression while he was in the county jail. He was on Sinequan. His suicide history consists of his making a suicide attempt while in the county jail. He obtained some psychotropic medications by telling medical staff that he was hearing voices. He then used the psychotropic medications to overdose.[4]
 
 
 18
 Cardew's clinical impression indicated that decedent was depressed. Her diagnostic impressions denoted that decedent suffered from adjustment disorder with depressed mood, and that decedent had a personality order with antisocial personality disorder. Cardew's global assessment of decedent's overall ability to function had decreased four points from his past assessment. Decedent's adjustment "within his community" and "to his incarceration" was labeled as "guarded." Although Cardew's report stated that decedent "is not suicidal, but he is depressed; and he is being treated for this [depression] by the Outpatient Mental Health Team," she also determined decedent to be "a moderate potential risk for suicide."[5]
 
 
 19
 The same day that decedent was seen by Cardew, decedent was interviewed by Defendant Mehra. Defendant Mehra's Comprehensive Psychiatric Evaluation stated:
 
 
 20
 This is a 31-year old single black male who is evaluated today because he was in Wayne County Jail, and placed on medication at that facility for depression. On interview, the patient states that since being locked up in jail he began feeling depressed, unable to eat and unable to concentrate, and has sleeping difficulties. He states he was seen by the psychiatrist in the County Jail, and was put on Sinequan, 200 mg. h.s. He has been taking this medication since 2-93. On further interview, the patient states that while he was in the County Jail he began hearing voices of laughter of different people. He was placed on Thorazine. He said the voices ended, and he was placed on Sinequan because he was feeling depressed. The patient admits having heard voices while he was out in the community. He states the voices did not bother him, so he did not seek treatment.The patient denies being seen by a psychiatrist or of being treated at any psychiatric facility in the past.
 
 
 21
 Based on decedent's representations and Defendant Mehra's interview impressions, Defendant Mehra recommended that decedent be maintained on Sinequan tablets, 200 mg. h.s. (at bedtime) for thirty days and that his medication be reviewed after thirty days. This was Defendant Mehra's sole contact with decedent.
 
 
 22
 On September 3, 1993, decedent was removed from the intake unit and transferred to central prison population. Thereafter, Decedent was given monthly appointments to meet with Defendant Cabrera. On September 14, 1993, decedent's first meeting with Defendant Cabrera, Defendant Cabrera's records indicate:
 
 
 23
 [Decedent]: Yeah--I'm depressed (gets teary-eyed) the medication helps a little bit. I always been depressed ... they took me off the medication for over a week and I got extremely depressed. I didn't feel like getting up or doing nothing. I'd hate to wake up every morning.
 
 
 24
 [Observations]: Denies suicidal ideas. Mood does seem depressed. Pt [patient] in good touch with reality. Admits anger as much as depression. Takes Rx regularly wo [sic] side effects. Agreed to a trial with higher doses of Sinequan. Falls asleep til early in am. Requested max. dose.
 
 
 25
 Thereafter, Defendant Cabrera increased decedent's anti-depressant medication from 200 mg. to 300 mg. per day.
 
 
 26
 On October 6, 1993, Defendant Cabrera met with decedent for a second time. At that meeting, Defendant Cabrera noted:
 
 
 27
 [Decedent]: It's alright ... still depressed ... I feel like I'm getting worse ... more & more depressed ... started to feel like I don't wanna live. (seems to be reacting to imprisonment of 25-60 years).
 
 
 28
 [Observations]: He understood his depression is reactive nevertheless he is scared that he might attempt to commit suicide. He has no plans and doubts if he has "the heart" to do so. Has experienced more confusion and "roving" thoughts but he is still in good touch with reality. Claims he was depressed "all my life" and actually has attempted suicide 3rd time: one while in jail. He was 16-17 y.o. at his first attempt by hanging. "There was no reason. I never had the will to live." On that occasion the belt he was using broke down. The second time he took and O.D. More than once he contemplated shooting himself. Tried to inject some hope about using different antidepressants. Already using Prozac, Norprain, Elavil and the only one that helped a bit was Sinequan. He is not having side effects and sleep is poor. Said he also used LCO3 and Sinequan.
 
 
 29
 Defendant Cabrera assessed decedent as suffering from severe depression and his treatment plan was to "switch gradually to another antidepressant. e.g. Asendin. Try both combined for a month."[6]
 
 
 30
 Thereafter, decedent was transferred to another cell block and transferred to a different doctor. On October 13, 1993, decedent was seen by Defendant Rodriguez. Defendant Rodriguez' evaluation indicated that "suicidal thoughts have crossed [decedent's] mind but he denies that he would harm himself because he cares about his family. Talked about several issues related to long-term depression process. Willing to work on that in individual psychotherapy."
 
 
 31
 Between decedent's next appointment with Defendant Cabrera, instead of Defendant Rodriguez (due to a scheduling mistake), decedent was seen by psychologist James Little, on October 18 and November 1, 1993. Little noted during those visits that decedent had stated, "some days I'd rather be dead." He also noted that decedent continued to be depressed and had some suicidal ideation.[7] Decedent also had difficulty sleeping and eating.
 
 
 32
 On November 2, 1993, Defendant Cabrera's evaluation noted:
 
 
 33
 It's alright. The medication makes me feel a little better. I don't have suicidal thoughts that often. I still sleep off and on. When I sleep good I feel good. Appetite seems improved. Affect less gloomy. Does not feel less depressed ... Says he noticed a change for the better about 2 1/2 weeks after beginning Sinequan plus Adsendin. Says anger not improved. A bit less confused....
 
 
 34
 Defendant Cabrera's assessment was labeled as "improved?".
 
 
 35
 Decedent was seen again by Defendant Rodriguez on November 15, 1993. Defendant Rodriguez' notes indicated:
 
 
 36
 [Decedent]: How come I was so damn stupid. Pt stated his main problem. He's locked up for something he didn't do. Feels nobody can change his situation. Expressed feelings and emotions about the whole process that brought him here. Repeated the medication helps him to be relax[ed] & less depressed.
 
 
 37
 Defendant Rodriguez concluded that decedent had "no suicidal thoughts."
 
 
 38
 The last person to see decedent was Little, whose reports indicated:
 
 
 39
 "I still feel like I want to kill myself." A[sic] pt's effect is flat--depressed--not doing very well--Pt feels sleeping ok. Very angry about being incarcerated, denies he committed the offense--Pt continues to have contact w/ support systems eg. s.o., with daughter and sister ... Discuss the importance of letting himself adjust to his incarceration before going ahead with suicide plan.
 
 
 40
 On November 28, 1993, decedent committed suicide by overdosing on pills prescribed for his depression.
 
 II. District Court Decision
 
 41
 On April 26, 1996, Defendants filed a motion for summary judgment. On November 25, 1996, the district court denied Defendants' motion, holding that a question of fact existed as to whether Defendants' actions constituted deliberate indifference.
 
 
 42
 On December 10, 1996, Defendants filed a motion for reconsideration and a motion for summary judgment on the grounds of qualified immunity. On January 14, 1997, the district court denied Defendants' motion for reconsideration and for summary judgment on the grounds of qualified immunity, stating that "[t]he right at issue in this case is that of plaintiff's decedent to receive necessary medical treatment, and, as I previously ruled, a question of fact exists whether the defendant psychiatrists exhibited deliberate indifference."
 
 
 43
 Defendants filed an interlocutory appeal, and the district court denied certification of the appeal as frivolous. This Court granted that appeal on the issue of "whether the plaintiff has alleged a claim of deliberate indifference to the medical needs of decedent."
 
 III. Jurisdiction
 
 44
 A court of appeals generally does not have jurisdiction over interlocutory appeals that have not been certified by the district court. See 28 U.S.C. §§ 1291, 1292. The Supreme Court, however, has provided an exception to this rule where a decision, although not terminating the action, does "finally determine claims of right separable from, and collateral to, rights asserted in the action." Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949). A district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is such a collateral order and is appealable as a final decision within the meaning of § 1291. See Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817-18, 86 L.Ed.2d 411 (1985). This Court does not attempt to make any factual findings, or to weigh the sufficiency of the evidence. Rather, this Court must determine, as a matter of law, whether the facts, when considered in the light most favorable to Plaintiff, could establish a violation of a clearly established right. Thus, we review the district court's ruling on qualified immunity de novo. Sanderfer v. Nichols, 62 F.3d 151, 153 (6th Cir.1995).
 
 IV. Qualified Immunity
 
 45
 Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), established the rule that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id.
 
 
 46
 To determine whether qualified immunity applies, it must first be determined what, if any, constitutional right has allegedly been violated under the existing law.[8] Next, it must be shown that the allegedly violated constitutional right was 'clearly established.' Finally, the law must be sufficiently clear such that a reasonable official would have understood that his acts or omissions violated that clearly established right. Dickerson v. McClellan, 101 F.3d 1151, 1157-58 (6th Cir.1996).
 
 
 47
 In the instant case, the right at issue is the right of decedent to receive necessary psychiatric care. Although Defendants assert that the right involved is the right to be screened for suicidal tendencies, Defendants' assertion is misplaced. Defendants rely principally on this Court's decisions in Horn v. Madison County Fiscal Court, 22 F.3d 653 (6th Cir.1994), Rich v. City of Mayfield Heights, 955 F.2d 1092 (6th Cir.1992), and Danese v. Asman, 875 F.2d 1239 (6th Cir.1989). However, in those cases this Court addressed the right of pretrial and juvenile detainees to be screened by the city and police officials for a detainee's suicidal tendencies. None of those cases, however, applied to the failure of a psychiatrist to render an inmate the necessary medical treatment required to respond to his psychiatric disorders.
 
 
 48
 Further, the case at bar does not involve the failure to screen for suicidal tendencies as Defendants would believe. Here, decedent was indeed screened for such tendencies and was determined to be moderately suicidal. This is a case of whether the alleged failure of psychiatrists, who were sufficiently trained to provide necessary treatment to decedent's serious psychiatric needs (the risk of suicide), consciously disregarded those needs in violation of the Eighth Amendment. Thus, to so particularize the right as Defendants would like, would in essence "allow appellants, and future defendants, to define away all potential claims." See, e.g., Newell v. Sauser, 79 F.3d 115, 117 n. 3 (9th Cir.1996).
 
 
 49
 Plaintiff has alleged, and we agree, that existing law has long established that an inmate has the right to receive necessary medical treatment and the failure to provide such treatment amounts to a violation of decedent's constitutional rights. This right has been clearly established. See Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) (a prison doctor's deliberate indifference to the serious medical needs of prisoners constitutes unnecessary and wanton infliction of pain.); see also McKee v. Turner, No. 96-3446, 1997 WL 525680, * 3 n. 2 (6th Cir. Aug. 25, 1997) (applying Estelle to a psychiatrist's alleged disregard to inmate's risk of suicide which ultimately occurred in April 1993).
 
 
 50
 Consequently, having shown that the constitutional right to necessary medical treatment is "clearly established," it must now be determined whether Defendants were deliberately indifferent to decedent's medical needs.[9]
 
 
 51
 The Eighth Amendment of the United States Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII. "The [Eighth] Amendment embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency.' " Estelle v. Gamble, 429 U.S. 97, 101, 97 S.Ct. 285, 289, 50 L.Ed.2d 251 (1976) quoting Jackson v. Bishop, 404 F.2d 571, 579 (8th Cir.1968). It is offensive to the standards of the Eighth Amendment when those who are punished by incarceration are not afforded this reasonable and essential constitutional protection. Prison inmates, for example, "must rely on prison authorities to treat [their] medical needs; [and] if the authorities fail to do so, those needs will not be met." Estelle, 429 U.S. at 103, 97 S.Ct at 290. Thus, it has been held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." Estelle, 429 U.S. at 104-05, 97 S.Ct. at 291 (quoting Gregg v. Georgia, 428 U.S. 153, 182-83, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)). However, to establish a cognizable claim, the alleged acts or omissions must be sufficiently harmful to evidence deliberate indifference. Estelle, 429 U.S. at 106, 97 S.Ct. at 292.
 
 
 52
 Almost twenty years after the Supreme Court rendered its decision in Estelle, the Court found itself having to further clarify the standard necessary to demonstrate "deliberate indifference." In Farmer v. Brennan, 511 U.S. 825, 847, 114 S.Ct. 1970, 1984, 128 L.Ed.2d 811 (1994), where a transsexual inmate brought a Bivens action against prison officials for deliberate indifference by placing him in general population, the Supreme Court rejected petitioner's arguments, holding that "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Id. The Court likened "deliberate indifference" to criminal recklessness, requiring a subjective showing that a defendant was aware of the risk of harm.
 
 
 53
 The Court, however, did not reach this conclusion without providing the lower courts with insight as to how to determine when the level of "deliberate indifference" may have been reached. The Supreme Court stated:
 
 
 54
 Under the test we adopt today, an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.... Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.... For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk ... was 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus, 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.'
 
 
 55
 Farmer, 511 U.S. at 842-43, 114 S.Ct. at 1982. (citations omitted).
 
 
 56
 Further, the "[u]se of 'deliberate,' for example, arguably requires nothing more than an act (or omission) of indifference to a serious risk that is voluntary, not accidental.... And even if "deliberate" is better read as implying knowledge of a risk, the concept of constructive knowledge is familiar enough that the term "deliberate indifference" would not, of its own force, preclude a scheme that conclusively presumed awareness from a risk's obviousness." Id. at 840, 114 S.Ct. at 1980.
 
 
 57
 In the medical context, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. To state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle, 429 U.S. at 106, 97 S.Ct. at 292. However, the Second Circuit in Hathaway v. Coughlin, 99 F.3d 550, 554 (2nd Cir.1996), clarified, and this Court agrees,
 
 
 58
 that in raising the issue of medical malpractice in Estelle, the Supreme Court was not establishing a per se rule precluding any malpractice from being actionable under the Eighth Amendment. Rather, it raised the concept to explain that certain kinds of medical misconduct--specifically, the 'inadvertent failure to provide medical care' and 'negligen[ce] in diagnosing or treating a medical condition,' (citations omitted), did not rise to the level of deliberate indifference. The Supreme Court's statement, however, cannot be construed to mean that there are no instances of malpractice that can rise to the level of deliberate indifference.
 
 
 59
 Id. We now turn to the case at bar.
 
 V. Defendant Mehra
 
 60
 Defendant Mehra's sole visit with decedent occurred on August 30, 1993. Defendant Mehra evaluated decedent as a part of intake procedures. At no time was decedent assigned to Defendant Mehra's psychiatric team. Available to Defendant Mehra at the time of his evaluation were: the Pre-sentence Investigation Report, Nurse Keller's report, and Psychologist's Duckworth's report. The Wayne County Discharge Planning-Referral Form was not received until September 7, 1993, and Psychologist Cardew's report was not dictated until September 2, 1993. In addition, Defendant Mehra did not have the report indicating that decedent's psychological sceening test had been red-flagged.
 
 
 61
 The Presentence Investigation Report indicated that decedent had attempted suicide in WCJ by an overdose. Duckworth's report, however, indicated that decedent did not have suicidal ideation. Based on this limited information, Defendant Mehra, perhaps negligently, prescribed Sinequan tablets for decedent, and recommended a follow-up in thirty days.
 
 
 62
 Although in hindsight Defendant Mehra should have required that extra precautions be taken and/or that decedent be watched, such a negligent failure to do so is not sufficient to maintain an Eighth Amendment claim for deliberate indifference. Defendant Mehra simply did not have all of the apparent information that Defendants Cabrera and Rodriguez had available. Further, Defendant Mehra neither had the benefit of reviewing the other evaluations taken at SPSM, nor the increased exposure to decedent in order to appreciate the gravity of decedent's serious risk of suicide. Consequently, Plaintiff has failed to state a claim of deliberate indifference as a matter of law against Defendant Mehra.
 
 VI. Defendants Cabrera and Rodriguez
 
 63
 Conversely, Plaintiff has alleged facts sufficient to maintain a claim of deliberate indifference as to Defendants Cabrera and Rodriguez. Both Defendants Cabrera and Rodriguez were decedent's treating psychiatrists. Defendant Cabrera saw decedent on three occasions and Defendant Rodriguez on two occasions. Both Defendants Cabrera and Rodriguez had decedent's prior medical evaluations at SPSM, the information sent from WCJ, (including the Wayne County Discharge Planning-Referral Form), as well as decedent's own warnings that he was contemplating suicide.
 
 
 64
 The records clearly indicate that: 1) decedent had attempted suicide by an overdose at WCJ, 2) he continued to have suicide thoughts, 3) he previously had been placed on liquid medication, 4) he had a suicide plan, and 5) he planned to wait until after his sentence to carry it out.[10] Defendants Cabrera and Rodriguez also had Cardew's report which indicated that decedent was a moderate potential risk for suicide. In addition, Little's report indicated that decedent had some suicidal ideation.[11] Decedent himself re-iterated that he had attempted suicide on three prior occasions, he's always been depressed, he never had the will to live, and that some days he'd rather be dead. These admonitions are all clear indicators that Defendants Cabrera and Rodriguez were aware of decedent's serious risk of suicide.[12]
 
 
 65
 Accordingly, this Court cannot find that decedent's risk of suicide was not obvious and expressly noted. A claim may be established that Defendants Cabrera and Rodriguez obviously disregarded the fact that decedent should have been administered liquid medication.[13]
 
 
 66
 Thus, it cannot be said that these acts or omissions amounted to anything more than inadvertence, or poor medical judgments. See Estelle, 429 U.S. at 105-06, 97 S.Ct. at 292. There are facts sufficient to permit a trier of fact to find that Defendants Cabrera and Rodriguez had actual knowledge of the serious risk of suicide, and that their continued course of treatment constituted deliberate indifference to that risk. See Farmer, 511 U.S. at 842, 114 S.Ct. at 1982. Whether such indifference was criminally reckless is a determination that should be made by a jury, not this Court. Thus, Defendants Cabrera and Rodriguez were correctly denied qualified immunity.
 
 
 67
 The judgment of the district court is AFFIRMED as to Defendants Cabrera and Rodriguez, and REVERSED and REMANDED for order of dismissal as to Defendant Mehra for failure to state a claim of deliberate indifference as a matter of law.
 
 
 68
 BOGGS, Circuit Judge, concurring in part, and dissenting in part.
 
 
 69
 The issue on appeal in this case is whether the district court properly denied the appellants' motion for summary judgment on the grounds of qualified immunity as to the Eighth Amendment deliberate indifference claim underlying the plaintiff's section 1983 action. I agree with the majority's disposition of this case as to Dr. Mehra. However, I must dissent as to the other appellants because I believe that under the facts of this case and existing law all three appellants should be granted summary judgment for the simple reason that the conduct alleged by the plaintiff does not satisfy the threshold condition of stating facts that constitute a violation of the Eighth Amendment's prohibition against deliberate indifference to the serious medical needs of a prisoner.
 
 
 70
 The short and simple synopsis of this case is this: Wade had attempted suicide eight months before coming to SPSM, by hoarding pills, apparently a common practice at Wayne County jail. After he came to SPSM, he was seen at least 12 times in 3 months by a number of psychiatric and medical professionals. They clearly recognized that he was depressed, and at some risk of suicide, though his condition varied, and he specifically denied wanting to commit suicide before this appeal was finished. His medication was changed twice, and individual psychotherapy sessions were scheduled and carried out.
 
 
 71
 It is true that medication was ordered in pill form, but under a regimen where pills were to be consumed under the observation of the dispensing nurse, exactly to prevent the hoarding of pills. The only constitutional violation alleged against Doctors Cabrera and Rodriguez is that they did not shift Wade's medication away from pills to liquid. (Pills had been originally prescribed by Dr. Mehra, who is correctly found to have committed no violation.)
 
 
 72
 In short, today's decision only makes sense if there were some evidence, even by inference and in the light most favorable to the plaintiff, that Drs. Cabrera and Rodriguez, while seeing the patient, adjusting his medication, scheduling treatment sessions, and otherwise appearing by all indications as though they were doing their best to control and improve Williams's medical problems, actually were also saying to themselves, "What the hell, we know he may commit suicide and that we could stop it by switching to liquid, but we just don't give a damn." There is absolutely no evidence to create any genuine issue of material fact, in my opinion, as to such an attitude, and I accordingly respectfully dissent.
 
 
 73
 * The majority is affirming the denial of qualified immunity for two prison psychiatrists on the Outpatient Health Team at SPSM, Doctors Cabrera and Rodriguez. The majority's analysis, however, is troubling for several reasons. To begin with, it misstates the first step in the well-established framework for analyzing qualified immunity claims. The threshold inquiry is "whether, based on the applicable law, a constitutional violation occurred." Dickerson v. McClellan, 101 F.3d 1151, 1157 (6th Cir.1996). It is not, as the majority claims in Part IV of its opinion, simply determining what constitutional right has allegedly been violated. Of course, identifying the right allegedly violated is a necessary step in determining whether a constitutional violation has occurred. But this court's case law makes clear that it is not enough to merely identify the right that was allegedly violated.
 
 
 74
 Judge Jones's opinion in Centanni v. Eight Unknown Officers properly defines "[t]he threshold issue" as determining "whether a constitutional right has been violated." 15 F.3d 587, 589 (6th Cir.1994) (emphasis added). That opinion also illustrates that making this threshold determination requires an appellate court to consider in a light most favorable to the plaintiff the facts alleged by the complaining party and the undisputed facts in the record and analyze these facts in accordance with the applicable substantive law to see if a violation occurred on those facts.
 
 II
 
 75
 The task of making the threshold determination of whether the plaintiff states an Eighth Amendment claim of deliberate indifference to the decedent's serious medical needs is complicated by defects in the statements of fact provided in Parts I and VI of the majority opinion. Viewing the facts in a light most favorable to the plaintiff does not mean that we ignore undisputed facts in the record that are not favorable to her claim of a constitutional violation.
 
 
 76
 One problem with the majority's statement of facts appears in its discussion of Ms. Alcala-Cardew's assessment of the decedent on August 30, 1993. The portion of her report quoted by the majority in the text at page six omits the next two sentences, which state: "He [decedent] denies being suicidal currently stating that he has his mother, his brothers and sisters, his fiancee, and his daughter who are in support of him. He is also currently on Sinequin and being followed by the Outpatient Mental Health Team here at RCC."
 
 
 77
 By skillfully redacting other portions of Ms. Alcala-Cardew's report, the majority is able to make her assessment that "the decedent's adjustment 'within his community' and 'to his incarceration' was 'guarded' " and that he was a "moderate potential risk for suicide"[1] appear to be an ominous and obvious signal portending his ultimate fate. These statements, however, lose their effect as harbingers of tragedy when one considers the portion of Ms. Alcala-Cardew's assessment stating that the decedent "is not suicidal, but is depressed; and he is being treated for this by the Outpatient Mental Health Team." (emphasis added). Furthermore, the majority makes no mention of Ms. Alcala-Cardew's final recommendation that "[a] referral is being made to the Outpatient Team to continue his being followed by them."
 
 
 78
 Another significant omission from the majority's summary of facts is the undisputed testimony of a psychiatrist from the Wayne County Jail confirming that there had been a "number of instances in the Wayne County Jail where inmates would be able to hoard medication by not taking the medication they were prescribed." This is especially significant in view of other undisputed facts pertaining to the method used to dispense drugs at SPSM, which were also omitted from the majority's recitation of facts. At SPSM, prisoners had to line up in front of a window. They would receive their prescribed medication from a nurse as their names were called, and they were required to take the medication in front of the nurse.
 
 
 79
 A reader of the majority's statement of facts would also not be aware that it was upon Doctor Rodriguez's recommendation following his October 13, 1993 session with decedent that the decedent's treatment regimen was enhanced to include bi-weekly individual psychotherapy with Mr. Little. In his first session with Mr. Little, the decedent did, as the majority notes, say that some days he would "rather be dead." The majority, however, omits that in his first session the decedent also acknowledged that he "had a good support system in the world." Although in his second session with Little the decedent admitted that he was "still feeling really down," this statement is less ominous when it is viewed in the context of the decedent's entire sentence that he was "still feeling really down but [that he] want[ed] to work on [his] appeal." Furthermore, although Little did note that the decedent had suicidal ideation[2], he also observed that he had "no immediate suicide plans." Mr. Little's observations are also redacted in the majority's discussion of his last session with the decedent to reinforce the impression that the decedent had a definite plan to commit suicide. The majority, despite its discussion at note 11, simply ignores Mr. Little's undisputed testimony that the decedent said he would commit suicide if he did not prevail on his appeal. Although the majority refers to this statement as "wishful thinking" and the statement turned out to be false, there is no dispute that the statement was recorded by Mr. Little, and available to Drs. Cabrera and Rodriguez. The statement indicates that suicide was a contingency the decedent was considering sometime in the future if he did not win his appeal, not "a definite plan" he was intent on carrying out immediately. This omission is particularly important in light of the majority's emphasizing at page five that Wade said in August 1993 that he would "wait until after sentencing on Thursday" to commit suicide and did not attempt to do so until four months later.[3]
 
 
 80
 Once the gaps in the majority's statement of facts are corrected, what the record clearly indicates is: 1) that the decedent attempted suicide by overdosing on anti-depressants in December 1992[4] while at Wayne County Jail--a place where prisoners were frequently able to hoard drugs; 2) that the decedent continued to have suicidal ideations (i.e., thoughts about killing himself), but he never articulated a specific plan while at SPSM[5]; 3) the decedent's medication was switched from liquid back to tablets when he was transferred to SPSM, where inmates were required to take each dosage of their medication in the presence of a nurse; 4) Ms. Alcala-Cardew reported that the decedent was "not suicidal" but "depressed" and classified him as a "moderate potential[6] risk for suicide." (emphasis added); 5) the decedent himself made ambiguous and varying statements as to his condition, some of which, especially towards the end of his life, indicated that he was improving and intent on seeing his case through the appellate process[7]; 6) between August 20, 1993 and November 28, 1993, the decedent had at least 12 sessions with seven different members of the staff at SPSM; 7) during these sessions his medication was supplemented and altered in response to his condition on more than one occasion, individual psychotherapy was added to his treatment regimen, and the effect of these changes in treatment were monitored and appeared to be helping as late as November 15, 1993; and 8) on November 28, 1993, approximately eleven months after his attempted suicide at Wayne County, the decedent killed himself by overdosing on medication he somehow managed to hoard despite safeguards intended to ensure that he actually ingested his medication.[8]
 
 III
 
 81
 I do not believe that these facts establish that any of the defendants were deliberately indifferent to the decedent's serious medical needs. It is well established that something more than negligence or medical malpractice is required for a claim of deliberate indifference. Estelle, 429 U.S. at 107, 97 S.Ct. at 292-93. This is not to say that conduct that violates the Eighth Amendment could not also be medical malpractice. Rather, conduct in violation of the Eighth Amendment's prohibition against deliberate indifference would provide an egregious instance of medical malpractice or be an intentional tort. This is because for the acts or omissions of a doctor to rise to the level of an Eighth Amendment violation, it is not enough that a reasonable person in the defendant's position reasonably should have known facts from which he reasonably should have drawn the inference that a substantial risk of serious harm exists. See Farmer v. Brennan, 511 U.S. 825, 837-38, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994) (rejecting objective standard for deliberate indifference). Rather, the Supreme Court has adopted a more exacting subjective standard for deliberate indifference which includes a showing that the official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Ibid. This subjective standard is appropriate because the Eighth Amendment "outlaws cruel and unusual punishment. " Ibid. (emphasis added). It leaves to tort law "an official's failure to alleviate a risk that he should have perceived but did not " because under existing Eighth Amendment jurisprudence such tragedies cannot be "condemned as the infliction of punishment." Ibid. (emphasis added).
 
 
 82
 The problem with the majority's conclusion becomes more apparent when this case is analyzed in a meaningful way against cases factually analogous to this one, in which this court has held that there was no evidence of deliberate indifference as a matter of law. For example, in McKee v. Turner, No. 96-3446, 1997 WL 525680 at * 1, (6th Cir. August 25, 1997), which the majority cites, the mother of a prisoner who committed suicide by hanging himself brought a section 1983 claim against the prison psychiatrist who was treating her son at the time of his suicide. She alleged that the doctor was deliberately indifferent to her son's serious medical needs. Six weeks before he was transferred to the Ohio Correctional Facility where he committed suicide by hanging himself, the decedent had attempted to hang himself at the Hamilton County Jail. Id. at * 2. The psychiatrist treating him at the state facility, Dr. Morcos, knew of this prior suicide attempt. Ibid. Dr. Morcos had concluded that the decedent was suffering from "hallucinations," "delusions" and severe "depression" and that he had a personality disorder that made him impulsive and aggressive. Ibid. Despite these problems and the prior suicide attempt, Dr. Morcos never felt that the decedent appeared "to be at imminent risk of suicide." Ibid. The doctor was, however, wrong, because after three months at the state facility, the decedent succeeded in taking his own life by hanging himself.[9]
 
 
 83
 The plaintiff proffered two affidavits by another psychiatrist, who served as her expert witness. One of these affidavits stated that Dr. Morcos's conduct "in light of the above circumstances, constituted, at a minimum, a significant departure from the accepted standards of psychiatric care." The other stated that in view of the decedent's "recent suicide attempt" and that given Dr. Morcos's diagnosis of "psychotic depression," providing the decedent with "no meaningful psychiatric treatment other than low dose triavil, without special monitoring" constituted "deliberate indifference to a substantial risk to [the decedent's] safety." Despite these affidavits and the undisputed facts of the case, a panel of this court held that "summary judgment in favor of Dr. Morcos was appropriate as a matter of law." Id. at * 5.
 
 
 84
 The panel in McKee reasoned that disputed issues of fact pertaining to "whether the medication being given was appropriate, and whether this suicide could have been predicted and prevented" were "immaterial." Ibid. This was because "[a]t most, these facts demonstrate that there is a difference of opinion among professionals as to what the accepted practice within the psychiatric community is." And such a difference of opinion, the panel observed, "constituted negligence or medical malpractice" but, as a matter of law, not deliberate indifference.
 
 
 85
 Although McKee is an unpublished opinion, and therefore only persuasive to the extent that its reasoning is persuasive, I find this reasoning persuasive and directly applicable to the present case. In each case the plaintiff's claim boiled down to: 1) the doctor provided the wrong medication; 2) they should have realized that it was imminent that prisoners they had diagnosed as severely depressed would again attempt to commit suicide by the same means they had attempted to kill themselves while at a county jail; and 3) greater precautions should have been taken to prevent the decedents' suicides. As the panel in McKee explained, even when assumed to be true, such allegations do not amount to deliberate indifference--that the defendant doctors "had knowledge of facts about [the decedent] from which [they] could draw the inference that [the decedent's] present course of treatment presented a substantial risk of serious harm to [the decedent], and that [the doctors] actually drew that inference, but persisted in the course of treatment anyway." Ibid. The majority attempts to distinguish the McKee case by stating (at note 12) that McKee only involved a difference of opinion among medical professionals and here there is no such dispute. In fact, in McKee there was at least an affidavit by a doctor that stated in conclusory language that the actions there constituted deliberate indifference. In this case, plaintiff's expert said no more (J.A. 413), and perhaps even less. He mainly claimed that the doctors' actions "represented significant deviations from the standard of care" and constituted "intentional disregard of the principles of treatment," not of Wade's rights.
 
 
 86
 The soundness of this reasoning is further demonstrated by comparing the present case to cases in which this court has found the facts sufficient to raise a claim of deliberate indifference resulting from a lack of medical care. In Boretti v. Wiscomb, 930 F.2d 1150 (6th Cir.1991), a prisoner's Eighth Amendment deliberate indifference claim against a prison nurse was permitted to go to a jury. The prisoner had just undergone surgery for a gunshot wound to his leg. Contrary to the prison doctor's express orders, the nurse repeatedly refused to change the prisoner's bandages, or give him pain medication. Id. at 1151. When the prisoner told the nurse that he had been using toilet paper and soap to clean his wound, the nurse responded that she did not have time for him and "could not be bothered with his petty excuses." Id. at 1152. On another occasion when the prisoner told the nurse that his leg was hurting badly and that his bandages were filthy, she informed him that "she had no intention of contacting the doctor and that he could see the doctor in five days and then walked away." Ibid. This obdurate refusal to provide any care for the prisoner, even the care prescribed by the doctor, persisted for five days.
 
 
 87
 These allegations were sufficient to create a triable issue as to whether the nurse was deliberately indifferent to the prisoner's serious medical needs. The panel reasoned that the facts alleged demonstrated "unnecessary suffering" resulting from the "denial of medical care" under circumstances where relief was readily available. Id. at 1155 (emphasis added). Thus the nurse's conduct was "not inadvertence or error in good faith," rather it exhibited the kind of "obduracy and wantonness" necessary to establish deliberate indifference. Id. at 1154.
 
 
 88
 A similar claim of an obdurate and wanton refusal to provide care for a prisoner's serious medical needs caused this court to permit a deliberate indifference claim against a doctor to proceed to trial in Weeks v. Chaboudy, 984 F.2d 185 (6th Cir.1993). The prisoner was paralyzed from the waist down but was placed in a portion of the prison where he was not permitted to have a wheelchair. Id. at 187. Wheelchairs were only permitted in the prison infirmary. The doctor, who had been treating the prisoner throughout his incarceration, could have authorized the prisoner's transfer to the infirmary. Ibid. It was undisputed that it "was accepted practice to keep paralyzed inmates in the infirmary" since "it was the only area of the prison equipped to cater to their needs" and that the doctor knew the prisoner "would not have access to a wheelchair if not admitted to the infirmary." The doctor did not, however, admit the prisoner to the infirmary. He simply concluded that the prisoner is "presently locked in J Block so this negates the use of a wheelchair in his particular area. We will pursue other avenues of consultation and see if we can't derive some disposition of this man other than here in the infirmary." No other "disposition was found or attempted" by the doctor. Ibid.
 
 
 89
 As a result of being denied the use of a wheelchair, the prisoner was unable to take advantage of his limited out-of-cell time, or to shower himself. He could not care for his person or clean his cell from May 3, 1983 to February 4, 1985. Ibid. This court found that these facts stated a claim of deliberate indifference since the doctor knew of Weeks's paraplegia, knew that he could not have a wheelchair outside of the infirmary, could have admitted Weeks to the infirmary, and refused to do so or take any other steps to help the prisoner from May 3, 1983 to February 4, 1985. Ibid.
 
 
 90
 While it is indeed tragic that a young man took his life, I do not believe that the facts of this tragedy demonstrate the kind of obduracy and wantonness on the part of doctors Cabrera and Rodriguez necessary to state a claim of deliberate indifference to the serious medical needs of the decedent. The decedent was not denied medical care. The doctors did not refuse to see him. They did not sit by passively when his fluctuating condition appeared to worsen. To the contrary, they reacted. They supplemented the dosage of his medication, placed him on another anti-depressant to make his medication more effective, and placed him in individual psychotherapy. They did not take away or refuse to provide the decedent with medication. They did not simply give the decedent a bottle of pills and tell him to take two at bedtime. Rather, they had him receiving individual dosages from a nurse who watched him until she believed he had ingested the pills.[10]
 
 
 91
 In hindsight, it is clear that this safeguard failed and that a different course of treatment may have been better than the one selected. But that is not enough. Even when viewed in a light most favorable to the plaintiff, the facts of this tragedy do not provide grounds from which a jury could conclude that the doctors at SPSM knew the course of treatment they were following had a substantial risk of leading to the decedent's death by suicide uncompensated for by any gain and nevertheless "persisted in the course of treatment anyway." McKee, at * 5. Thus the plaintiff's allegations do not establish a violation of the Eighth Amendment's prohibition against deliberate indifference to the serious medical needs of a prisoner. Accordingly, the defendants are entitled to judgment as a matter of law and I dissent from the majority's conclusion to the contrary.
 
 
 
 [1]
 A 'guarded prognosis' is defined as "[a] prognosis given by a physician when the outcome of a patient's illness is in doubt." TABER'S CYCLOPEDIC MEDICAL DICTIONARY 827 ( 18th ed.1997)
 
 
 [2]
 Sinequan concentrate is administered in a liquid form, Lithium Citrate is a syrup, and Prolixin is taken either by an injection or in a concentrate liquid form
 
 
 [3]
 Deposition testimony of Eugene Schimmel, an employee of Wayne County Jail, indicates that given the nature of decedent's statement and the fact that decedent did receive a long term sentence, the medical staff believed that his potential for suicide would increase, and "[t]hat's specifically why we had to--had the Discharge Summaries sent to the prison, so they would be alert." (emphasis added)
 
 
 [4]
 Although the dissent relies on the next two observations in Cardew's report that "[decedent] denies being suicidal currently stating that he has his mother, his brothers and sisters, his fiancee, and his daughter who are in support of him," the testimony of Psychologist Darryl Little indicates that "people don't necessarily divulge that piece of information, that they are going to commit suicide, but there are other indicators that help us to see that maybe there is the immediacy of that suicide taking place." (emphasis added)
 
 
 [5]
 Cardew's final assessment was "[t]here are no recommendations for this man at this time," however, this statement is further clarified by Cardew's deposition which states that decedent was not recommended for therapy for his potential suicide because "he didn't qualify for the limited resources that we have. We can't--there are many, many people that I see in intake who I think need therapy; however, there is not therapy available to them." (emphasis added)
 
 
 [6]
 Instead of prescribing liquid medication to decedent in the face of all of decedent's admonitions, Defendant Cabrera took what he called the "bold step" of prescribing decedent two forms of medication in tablet form. (emphasis added). This action is more egregious when you evaluate Defendant Cabrera's deposition testimony, where he admits that decedent was "extremely depressed," his condition was worse than severe, and that decedent was scared that he might attempt suicide. Rather, Defendant Cabrera relied, what appears to be, solely on decedent's statement that he didn't think he'd have "the heart" to do it--knowing full well that decedent did have "the heart" to do it because decedent had attempted suicide on three prior occasions, and once by overdose. Further, Defendant Cabrera's own testimony states that "the most important element here is the fact that he had tried first to commit suicide at 16 years of age, which means that the suicide problem was a very chronic one." (emphasis added)
 The dissent relies on the fact that psychotropic medication is dispensed in the pill line, but this fact negates the obvious: If the problem of suicide is very chronic and decedent is worse than severely depressed, albeit receiving some form of therapy to address the depression, but nevertheless severely depressed; and decedent has a suicide plan (which the dissent fails to distinguish from suicide intent), and has already hoarded pills on a prior occasion; and the only reason why liquid medication is not dispensed in the pill line is because "it would take a longer amount of time," the continued administration of medication in tablet form is still an obvious disregard for the life of decedent. Moreover, it is misleading to suggest that the administration of decedent's medication through a pill line was a precautionary measure and/or special treatment that Defendants put in place to thwart any suicide attempt by decedent. Such was not the case, this is simply a regular procedure for the administration of all psychotropic medications, which may or may not have had a history of working effectively. No special consideration and/or thought was made for the protection of decedent.
 
 
 [7]
 The dissent attempts to distinguish suicidal ideation from a suicide plan and suicide plan from a suicide intent, suggesting that decedent only had suicide ideation. However, although Little's report indicates that decedent had some suicidal ideation, records also reveal that he had a suicide plan. The dissent, however, fails to distinguish a suicide plan from suicide intent, though it states that such a distinction exists
 
 
 [8]
 Although the dissent maintains that the majority has misstated the first step in an inquiry as to whether a constitutional violation has occurred, it is intuitive in a finding of "whether a constitutional violation has occurred" to first determine what constitutional right, if any, has allegedly been violated. This does not alter existing case law, rather it clarifies it by fleshing out what must first be shown in order to make the ultimate determination of whether there has been a constitutional violation of a clearly established right. Upon such a showing of the constitutional right involved, the Court then looks to existing case law to determine if the facts as presented by Plaintiff, and if proven, demonstrate Defendants violated a clearly established right. See Monday v. Oullette, 118 F.3d 1099, 1102 (6th Cir.1997)
 Traditionally, this Circuit has stated that the first step in determining whether a defendant is entitled to qualified immunity is to determine "whether a constitutional violation has occurred." However, when analyzing this question this Court has proceeded by: 1) looking at the alleged constitutional right involved, 2) determining what clearly established law makes the defendant's alleged actions a violation of that constitutional right; and 3) determining whether that law was so clearly established that reasonable officials would have known. See, e.g., Dickerson v. McClellan, 101 F.3d 1151, 1157 (6th Cir.1996) (the court laid out its analysis of whether defendants were entitled to qualified immunity for violating the "knock and announce" requirement by stating, "[Constitutional right involved] The Fourth Amendment protects '[t]he right of the people to be secure in their persons, house, papers, and effects, against unreasonable searches and seizures.' [Clearly established existing law] The Sixth Circuit has long held that 'the fourth amendment forbids the unannounced, forcible entry of a dwelling in the absence of exigent circumstances.' [Reasonable objectivity] Therefore, ... we must determine 'whether an objectively reasonable officer, confronted with similar circumstances, could have reasonably believed that exigent circumstances existed' to justify noncompliance.") (citations omitted); see also Gabbert v. Conn, 131 F.3d 793, 799 (9th Cir.1997) ("Analysis of a qualified immunity claim involves three steps: (1) identifying the specific right allegedly violated; (2) determining whether the right was so "clearly established" as to alert a reasonable officer to its constitutional parameters; and (3) determining whether a reasonable public officer could have believed that the particular conduct at issue was lawful.").
 In the instant case, rather than becoming so intertwined with semantics and to alleviate confusion, the majority has simply used different words to say the same thing, but has clarified the steps actually taken by this Circuit in evaluating a qualified immunity defense.
 
 
 [9]
 The question of whether Defendants are protected by qualified immunity turns on an objective legal reasonableness test. The use of this objective test, however, would run afoul to the requirements established in Farmer, which requires that there be a subjective showing of deliberate indifference. Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994) (An official must know of and disregard the risk to an inmate's health; and he must be aware of and draw the inference that a substantial risk of serious harm exists.). Consequently, this Court does not evaluate Defendants' qualified immunity defense under the objective test of whether a reasonable official would have known that his acts or omissions violated a clearly established right. Rather it is evaluated under the subjective test employed in Farmer. See also Hamilton v. Endell, 981 F.2d 1062, 1066 (9th Cir.1992) ("A finding of deliberate indifference necessarily precludes a finding of qualified immunity.")
 
 
 [10]
 Although my colleague in his dissent focuses on the fact that a psychiatrist from Wayne County Jail stated that there are "a number of instances in the Wayne County Jail where inmates would be able to hoard medication by not taking the medication they were prescribed," this is irrelevant given the fact that decedent did, in fact, hoard the medication that he was prescribed at WCJ, indicating that he was suicidal. Moreover, it does not negate the fact that the decedent continued to have a suicide plan of which Defendants were aware
 
 
 [11]
 The dissent would like to place emphasis on the observations by Mr. Little that although decedent was feeling down, he wanted to work on his appeal and had no immediate suicide plans. However, in Mr. Little's last session with decedent, just two weeks before decedent's suicide, Mr. Little stated, "[d]iscuss the importance of letting himself adjust to his incarceration before going ahead with suicide plan. " In addition, after Mr. Little's second visit, where he recommended a follow-up in two weeks, Mr. Little stated, "[t]here was a sense of urgency about the adjustment. If it was routine, I think I usually follow a person once a month, but it wasn't certainly routine."
 The dissent also seems to suggest that any suicide plan of decedent was contingent upon his failing to win on appeal. This was wishful thinking at best. Given decedent's history and the fact that he had attempted suicide in WCJ--before he was even found guilty and convicted of the offense--does not lend much support to an argument that decedent, now incarcerated for at least 25 years, would wait until a time consuming appeal was exhausted. Simply put, this is a case where an inmate, who is moderately potentially suicidal and severely depressed, was able to complete his prior overdose suicide attempt because Defendants' failed to take the more time consuming approach of administering liquid medication. The fact that decedent did not actually commit suicide until approximately three months after his statement of having a suicide plan does not negate the fact that decedent had a history of suicide attempts, was severely depressed, angry, and stated that he had no intentions of doing 25 years in jail. These are all very serious indicators of a serious risk of suicide. It's unfortunate that the dissent would rather the life of decedent be weighed by the measures of time in order to find culpability.
 
 
 [12]
 Although the dissent cites McKee v. Turner, No. 96-3446, 1997 WL 525680, * 3 (6th Cir. Aug. 25, 1997), to support its position that a claim for deliberate indifference has not been established, McKee is distinguishable from the case at bar. In McKee, the decedent attempted suicide in county jail and ultimately committed suicide while incarcerated at the Correctional Reception Center. The treating psychiatrist was sued and accused of failing to obtain county jail records which indicated that decedent had attempted suicide by hanging six weeks prior to his arrival at the correctional facility. Although the psychiatrist was aware of the decedent's previous suicide, he did not have prior knowledge of any other suicidal tendencies of decedent. Plaintiff, therefore, in support of her action, presented the affidavit of an opposing psychiatrist who stated that if the treating psychiatrist had obtained the medical records he would have discovered information about the decedent's suicidal tendencies, and even without the records decedent should have been placed on close watch. This court, in an unpublished opinion, however, determined that any conflicting evidence relating to "whether prior records on [the decedent] would have alerted the defendant to the likelihood that [decedent] would attempt suicide, and whether the medication being given was appropriate, and whether this suicide could have been predicted and prevented," were immaterial because those disputed facts, at most, demonstrated that "there is a difference of opinion among professionals as to what the accepted practice within the psychiatric community is." McKee, at * 4
 In this case, however, there is no dispute between medical professionals, and there is much more evidence presented than merely an opposing affidavit from a differing psychiatrist. Here, Defendants had the medical records and they knew that decedent had attempted suicide on prior occasions (once by overdose on medication); knew that decedent was placed on liquid medication; knew that Decedent had suicidal ideations and a suicide plan; and knew that he was severely depressed. Yet, rather than continuing decedent on liquid medication, they placed him on psychotropic medication in tablet form, which may have been in obvious disregard for his serious medical (suicide as well as depression) needs. Here, decedent not only attempted suicide on one prior occasion, as in McKee, but on three prior occasions. Decedent had more than suicidal tendencies, he was a suicide risk. Under the framework of Farmer, Plaintiff has alleged more than mere negligence and has alleged "acts or omissions sufficiently harmful to evidence deliberate indifference to decedent's serious medical needs." Estelle, 429 U.S. at 106, 97 S.Ct. at 292. (emphasis added).
 
 
 [13]
 The dissent states that "in hindsight, it is clear that this safeguard [administering decedent pills through a pill line] failed and that a different course of treatment may have been better than the one selected." (emphasis added). However, we do not need hindsight because Defendants had ample foresight and still failed to respond adequately
 
 
 [1]
 Ms. Alcala-Cardew expressly noted that Wade was "not suicidal." (JA 94). Several of the medical professionals who testified in this case, including Ms. Alcala-Cardew, explained the significant difference in the risk posed by a prisoner who is potentially suicidal, as opposed to actually suicidal. The majority seems to ignore this distinction
 
 
 [2]
 A psychiatrist from Wayne County gave undisputed testimony that "suicidal ideation" is distinct from a "suicide plan" and that a "suicide plan" is distinct from a "suicidal intent." "Suicidal ideation" refers to "an individual who is having thoughts about killing him or herself, but hasn't formulated a specific plan, or may not have the requisite intent or motive to actually carry out any urges or feelings of suicide."
 
 
 [3]
 The record does not appear to support an inference that this delay resulted from the need to hoard massive quantities of medication for a suicide attempt. Williams's own expert stated that "a three to five day supply of this medication would be lethal in overdose."
 
 
 [4]
 The record contains undisputed testimony by a psychiatrist that "recent suicide attempts" are a factor to be considered in determining the mode of treatment for a patient. However, this same testimony defines a "recent" suicide attempt as "anything within the previous three months."
 
 
 [5]
 The record does establish that the decedent informed the medical staff at Wayne County that he would wait and see what happened in court before he decided what he "was going to do." The Wayne County staff interpreted this statement to mean that the decedent was "still holding some suicidal thoughts." This, however, is far from being an articulable suicide plan that the staff at SPSM could thwart. An illustration of such a "suicide plan" may be found in Matje v. Leis, 571 F.Supp. 918, 922-23 (S.D.Ohio 1983), where prison officials were told that an inmate planned to commit suicide by overdosing on drugs that she planned to smuggle into the jail under a diaphragm. Prison officials subsequently strip searched the inmate, but in a manner that they admitted could not reveal the presence of a diaphragm. Ibid.Instead of searching for a diaphragm and contraband medication under it, the prison officials simply relied on the inmate's statement that she did not have a diaphragm. Ibid.She was then placed in general population and, on her first night in jail, she committed suicide by overdosing on drugs. Id. at 923
 
 
 [6]
 In her undisputed deposition testimony, Ms. Alcala-Cardew explained the difference between prisoners who are deemed "potentially suicidal" and those who are actually "deemed to be suicidal" and the difference in treatment for these two classes of prisoners. (JA 217)
 
 
 [7]
 On September 14, 1993 the decedent told Dr. Cabrera that he had no suicidal ideas. On October 6, 1993, decedent told Dr. Cabrera he felt he was getting worse and that he did not want to live but did not believe he had "the heart" to kill himself. During this same meeting the decedent relayed his three prior suicide attempts to Cabrera. In response, Dr. Cabrera altered his medication. On October 13, the decedent indicated to Dr. Rodriguez that his new medication was helping him and that he would not "harm himself because he care[d] about his family." At this session the decedent also agreed to address his long-term depression by engaging in individual psychotherapy with Mr. Little. In his first session with Little on October 18, 1993, the decedent said "somedays I'd rather be dead" but also stated that he "had a good support system in the world." On November 1, 1993, the decedent told Mr. Little that he was "still feeling really down, but ... want[ed] to work on [his] appeal." During this session, Little also noted that the decedent still had some suicidal ideation, but had "no immediate suicide plan." When the decedent met with Dr. Cabrera on November 2, 1993, he indicated that the addition of the second medication he had been prescribed by Dr. Cabrera on October 6, 1993 was helping. When Dr. Rodriguez met with the decedent on November 15, 1993 he was also led to believe that the combination of the two medications was helping the decedent and that the decedent had "no suicidal thoughts" at that time. During his last interaction with an SPSM staff member, Mr. Little, on November 22, 1993, the decedent said he would commit suicide if he did not prevail on his appeal, but had no "suicide plan" at that time. Six days later, he killed himself, his appeal still unresolved
 
 
 [8]
 The plaintiff's own expert stated that "a three to five day supply of [Sinequin] would be lethal in overdose."
 
 
 [9]
 This obviously means that the decedent was left with the means to carry out his second and successful attempt to hang himself
 
 
 [10]
 The majority emphasizes, at notes 6 and ll, that pills were given rather than liquids simply because liquids "would take a longer amount of time." The only evidence for this consideration is Doctor Cabrera's statement that liquids are not given in the pill line, only in the hospital, for this reason (JA 285), but there is no indication that this was a policy of the doctors, rather than of the institution. Read in context, Dr. Cabrera's testimony makes clear that the pill line was deemed an alternative means of assuring that Williams could not again hoard medication and actually strengthens the case in favor of qualified immunity. Similarly, the majority's emphasis on Ms. Cardew's statements about not giving psychotherapy after intake because of "limited resources" (see note 5) actually strengthens the case for qualified immunity on behalf of these doctors. Whatever might be the case as to the liability of the institutional or political leadership of the Michigan Prison System (cf. Birrell v. Brown, 867 F.2d 956, 959-60 (6th Cir.1989)) for any harm caused by lack of resources, that lack of resources, and reasonable policies to cope with it, cannot be a constitutional violation by these doctors. In any event, individual psychotherapy was indeed added to the treatment regimen