186 F.3d 685 (6th Cir. 1999)
 Ruth Ann Williams, Personal Representative of the Estate of Anthony Wade, Deceased, Plaintiff-Appellee,
v.
T.N. Mehra; Dr. Cabrera; Dr. Rodriguez, Defendants-Appellants,
John Jabe, Warden; Gerald Hofbauer, Deputy Warden; John Fisher, Security Guard; Jane Doe, Nurse, Defendants.
 No. 97-1118
 UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT
 Argued: September 23, 1998
Decided and Filed: August 4, 1999
 
 Appeal from the United States District Court for the Eastern District of Michigan at Detroit, No. 95-70665--John Feikens, District Judge.[Copyrighted Material Omitted]
 Marvin L. Bromley, Office of the Attorney General of Michigan, Mental Health Division, Thomas L. Casey, OFFICE OF THE ATTORNEY GENERAL, APPELLATE DIVISION, Erica Weiss Marsden, Office of the Attorney General, Social Services Division, Lansing, Michigan, for Appellants.
 James W. McGinnis, Detroit, Michigan, for Appellee.
 E. Michael Stafford, Assistant Attorney General, Office of the Attorney General, Corrections Division, Lansing, Michigan, for Defendants.
 Before: MARTIN, Chief Judge; KEITH, MERRITT, KENNEDY, NELSON, RYAN, BOGGS, NORRIS, SUHRHEINRICH, SILER, BATCHELDER, DAUGHTREY, MOORE, COLE, CLAY, and GILMAN, Circuit Judges.
 BOGGS, J., delivered the opinion of the court, in which KENNEDY, NELSON, RYAN, NORRIS, SUHRHEINRICH, SILER, BATCHELDER, and GILMAN, JJ., joined. KEITH, J. (pp. 693-95), delivered a separate opinion concurring in part and dissenting in part, in which MARTIN, C. J., DAUGHTREY, MOORE, COLE, and CLAY, JJ., joined. MERRITT, J. (pp. 695-97), delivered a separate opinion dissenting in part and concurring in part.
 OPINION
 BOGGS, Circuit Judge.
 
 
 1
 Anthony Wade committed suicide while incarcerated at the State Prison of Southern Michigan ("SPSM") following his conviction for murder and obstruction of justice. He killed himself by overdosing on the anti-depressant Sinequan (Doxepine), which the prison psychiatric staff had prescribed for him. Kameshwari Mehra,[1] Numa Cabrera, and Luis Rodriguez were prison psychiatrists who treated Wade at SPSM. Wade's mother, Ruth Williams, sued the Defendants for alleged violations of Wade's Eighth Amendment right to necessary medical care. Defendants asserted qualified immunity as an affirmative defense and moved for summary judgment. The district court dismissed the claims against Jabe and Hofbauer on the ground that they had no personal involvement in or knowledge of Wade's treatment and, therefore, could not be held liable for the alleged constitutional violations. The district court also granted summary judgment for Defendants-Appellants as to Williams's negligent supervision claim. However, the district court denied summary judgment for Defendants-Appellants as to Williams's deliberate indifference claim.
 
 
 2
 Mehra, Cabrera, and Rodriguez again moved for summary judgment, asserting qualified immunity. The district court denied the motion. Defendants-Appellants sought review of the district court's decision. A panel of this court affirmed the decision of the district court with respectto Cabrera and Rodriguez, and reversed the decision of the district court with respect to Mehra. This court granted rehearing en banc and holds that all three Defendants-Appellants are entitled to qualified immunity.
 
 
 3
 * The facts of this case were set forth in detail in the panel's opinion and dissent. See Williams v. Mehra, 135 F.3d 1105 (6th Cir. 1998). Wade was held in the Wayne County, Michigan, jail ("WCJ") from April 24, 1992 until August 20, 1993, several days before he was sentenced. He was depressed throughout this period, and was prescribed Thorazine to manage his symptoms. In December 1992, Wade attempted suicide by taking twenty Thorazine tablets that he had hoarded from his daily dosage. There is no allegation, nor evidence, that the administration of the pills to Wade was monitored to prevent hoarding. WCJ officials then switched Wade to liquid medication to prevent hoarding, and scheduled additional therapy sessions. Wade's condition continued to worsen, and in February 1993 he was transferred to Northfield Regional Psychiatric Hospital ("NRPH"). Doctors at NRPH prescribed Sinequan liquid, and Wade's condition improved. Upon his return to WCJ, Wade was continued on Sinequan liquid. There is no evidence that the administration of the Sinequan to Wade was monitored.
 
 
 4
 On August 20, 1993, Wade was transferred to SPSM to begin his sentence. SPSM received Wade's Pre-Sentence Investigation Report ("PSI") and the WCJ Discharge Planning-Referral Form ("PRF"). The PSI indicated that Wade had psychiatric problems and that he had attempted suicide by hoarding pills. The PRF indicated that Wade suffered from major depression with psychotic features and had repeated suicide thoughts. The PRF also listed Wade's medications as Sinequan liquid, lithium citrate, and Prolixin HCL. That same day, Wade was seen by a nurse at SPSM. He completed a health form, stating that he heard voices and that he was currently taking Thorazine. The nurse called WCJ and confirmed that Wade was taking Sinequan at bedtime rather than Thorazine.
 
 
 5
 On August 25, 1993, Wade was seen by a psychologist. A written test indicated that he was suffering from depression. On August 30, 1993, another psychologist examined Wade. Her report described Wade's suicide attempt and indicated that he was "a moderate potential risk for suicide." That same day, Mehra interviewed Wade. His report recommended that Wade be maintained on Sinequan tablets at bedtime for thirty days and then reevaluated. Mehra did not see Wade again. SPSM administered Wade's medication in a "pill line"--an arrangement in which each patient in turn receives medication from a nurse and takes it while the nurse watches. The pill line is designed to guard against pill hoarding.
 
 
 6
 On September 3, 1993, Wade was placed in the general prison population and scheduled for monthly appointments with Dr. Cabrera. On September 14, 1993, Cabrera saw Wade for the first time. He observed that Wade appeared depressed, noted that he denied having suicidal ideation, and increased his dose of Sinequan. On October 6, 1993, Cabrera saw Wade again and observed that Wade was scared that he might attempt suicide again, but that he had no plan to do so. Dr. Cabrera decided to switch Wade to another antidepressant, Asendin, and prescribed both combined for a month.
 
 
 7
 Wade was subsequently transferred to another cell block and to a different doctor, Dr. Rodriguez. On October 13, 1993, Dr. Rodriguez saw Wade and noted that suicidal thoughts had crossed Wade's mind, but that Wade denied that he would harm himself. A psychologist saw Wade on October 18, 1993 and November 1, 1993. He noted that Wade continued to be depressed and had some suicidal ideation. On November 2, 1993, Wade saw Dr. Cabrera again and stated that he didn't havesuicidal thoughts "that often." Cabrera's assessment was "improved?". On November 15, 1993, Dr. Rodriguez saw Wade again and observed that he had no suicidal thoughts.
 
 
 8
 On November 22, 1993, Wade again saw the psychologist he had seen on October 18 and November 1, who reported that Wade said he still felt as if he wanted to kill himself. On November 28, 1993, Wade killed himself with an overdose of Sinequan tablets that he had hoarded despite the precaution of the pill line.
 
 II
 
 9
 We review a grant or denial of summary judgment de novo, using the same Rule 56(c) standard as the district court. Cox v. Kentucky Department of Transportation, 53 F.3d 146, 149 (6th Cir. 1995) (citing Hansard v. Barrett, 980 F.2d 1059 (6th Cir. 1992)). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, we view the factual evidence and draw all reasonable inferences in favor of the non-moving party. National Enterprises v. Smith, 114 F.3d 561, 563 (6th Cir. 1997). To prevail, the non-movant must show sufficient evidence to create a genuine issue of material fact. Klepper v. First Am. Bank, 916 F.2d 337, 341-42 (6th Cir. 1990) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." Ibid. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.
 
 
 10
 We review mixed questions of law and fact de novo. Pullman Standard v. Swint, 456 U.S. 273, 287-88 (1982); United States v. Francis, 170 F.3d 546, 549 (6th Cir. 1999); United States v. Hazime, 762 F.2d 34, 37 (6th Cir. 1985). Lower court findings of ultimate facts based upon the application of legal principles to subsidiary facts are subject to de novo review. Whitney v. Brown, 882 F.2d 1068, 1071 (6th Cir. 1989); Taylor and Gaskin, Inc. v. Chris-Craft Indus., 732 F.2d 1273, 1277 (6th Cir. 1984).
 
 A. Jurisdiction
 
 11
 Under 28 U.S.C. 1291, we have jurisdiction to hear an appeal only from a "final decision" of the district court. The Supreme Court held that "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. 1291 notwithstanding the absence of a final judgment." Mitchell v. Forsyth, 472 U.S. 511, 530 (1985). The Court restated the Forsyth standard in 1995, holding that a denial of summary judgment is appealable if (1) the defendant is a public official asserting qualified immunity, and (2) the issue on appeal is not what facts the parties may be able to prove, but whether the plaintiff's facts, taken at their best, show a violation of clearly established law. Johnson v. Jones, 515 U.S. 304, 311 (1995). "Mitchell clearly establishes that an order rejecting the defense of qualified immunity at either the dismissal stage or the summary-judgment stage is a 'final' judgment subject to immediate appeal." Behrens v. Pelletier, 516 U.S. 299, 307 (1996). This court has recognized the standard articulated by the Supreme Court: "regardless of the district court's reasons for denying qualified immunity,we may exercise jurisdiction over the . . . appeal to the extent it raises questions of law." Dickerson v. McClellan, 101 F.3d 1151, 1157 (6th Cir. 1996) (emphasis added).
 
 
 12
 The key issue in the case before this court is whether Drs. Mehra, Cabrera, and Rodriguez were deliberately indifferent to Wade's serious medical needs. Williams argues that this is an issue of fact. If true, we would not have jurisdiction to hear the appeal. The doctors argue that for purposes of this appeal they do not contest the facts asserted by Williams, and that the appeal turns on a matter of law; viz, whether Williams's facts are sufficient to show a violation of clearly established law.
 
 
 13
 Whether the doctors were deliberately indifferent is a mixed issue of law and fact; or, as Whitney v. Brown put it, an issue of ultimate fact as distinguished from subsidiary or basic fact. 882 F.2d at 1071; see supra p. 689. The resolution of this question requires us to compare the doctors' conduct with a legal standard of deliberate indifference. The questions concerning Defendants' conduct--what actions they performed--are questions of subsidiary or basic fact. The question of the legal standard for deliberate indifference is a question of law. The question at issue in this case--whether the specifics of the doctors' conduct, as alleged by Williams, could constitute deliberate indifference--is a mixed question of law and fact. Because the doctors do not dispute the basic facts for purposes of this appeal, our decision turns on a question of law: whether the alleged facts, admitted for this purpose, show a violation of clearly established law. This analysis is in accord with the established standards of appellate review. We review summary judgments de novo, the factual findings of the trial court for clear error, and mixed questions of law and fact de novo. According to these well-established standards, we treat mixed questions as legal questions rather than as factual questions.
 
 
 14
 Because the case before us turns on whether Plaintiff's facts, admitted by Defendants for purposes of this appeal, "show[] a violation of 'clearly established' law," not on "which facts the parties may be able to prove," Johnson v. Jones, 515 U.S. at 311, the district court's denial of qualified immunity is a "final order" under 28 U.S.C. 1291, and we have jurisdiction to decide the case on the merits. See ibid. The facts that (if they were in dispute) would divest this court of jurisdiction to hear the appeal under Johnson v. Jones are the basic facts about the conduct and circumstances of the Defendants: Did they have certain records from WCJ? Did they know certain things about Wade? What did the nurses observe? Did the psychiatrists know what the nurses observed? Plaintiff's account of these basic facts is admitted by Defendants for purposes of this appeal. Therefore, there is no factual dispute that would divest this court of jurisdiction. The only "facts" in dispute are the ultimate issues to be decided by applying law to the basic facts: Did Defendants treat Wade with deliberate indifference? Did Defendants violate Wade's established constitutional rights? These "facts," however, are mixed issues of law and fact, which we treat as issues of law, not issues of fact. Whitney v. Brown, 882 F.2d at 1071. Disputes over such issues do not divest us of jurisdiction to hear the appeal.
 
 B. Defendant-Appellant Mehra
 
 15
 The panel held that Dr. Mehra was not sufficiently involved with Wade to support liability, so Plaintiff failed to state a claim of deliberate indifference against Dr. Mehra. See Williams v. Mehra, 135 F.3d 1105, 1114 (6th Cir. 1998), reh'g en banc granted, 144 F.3d 428. We hold below that even the doctors who had greater involvement with Wade were not, as a matter of law, deliberately indifferent to Wade, so Dr. Mehra a fortiori was not. Independent of our analysis below, we adopt the reasoning of the panel as to Dr. Mehra and hold thatPlaintiff failed to state a claim of deliberate indifference against him. Ibid.
 
 C. Qualified Immunity
 
 16
 "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The procedure for evaluating claims of qualified immunity is tripartite: First, we determine whether a constitutional violation occurred; second, we determine whether the right that was violated was a clearly established right of which a reasonable person would have known; finally, we determine whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights. Dickerson v. McClellan, 101 F.3d 1151, 1157-58 (6th Cir. 1996).
 
 
 17
 Our task is to apply the Dickerson analysis to the case before the court. First, we determine whether a constitutional right was violated. The constitutional right at issue is the Eighth Amendment proscription against "cruel and unusual punishments." Before we can use the Eighth Amendment as a practical legal standard, we must interpret its very abstract language into a more concrete form. In the context of medical care for prisoners, the Supreme Court has long held that the standard for asserting an Eighth Amendment claim is deliberate indifference:
 
 
 18
 an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.
 
 
 19
 Estelle v. Gamble, 429 U.S. 97, 105-06 (1976). Thus, properly stated, the right at issue is Wade's right not to have his serious medical needs treated with deliberate indifference.[2]
 
 
 20
 "[T]he Eighth Amendment does not apply to every deprivation, or even every unnecessary deprivation, suffered by a prisoner, but only that narrow class of deprivations involving 'serious' injury inflicted by prison officials acting with a culpable state of mind." Hudson v. McMillian, 503 U.S. 1, 20 (1992) (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)). "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of factsfrom which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994) (emphasis added).
 
 
 21
 In the case now before us, the action complained of is the failure of the doctors to change Wade's medication from tablets to liquid. For purposes of this appeal, we take the facts to be those alleged by Plaintiff and supported by more than a scintilla of evidence. Thus, we attribute to Drs. Cabrera and Rodriguez knowledge of the PSI, the PRF, the nurse's intake report, the five psychologists' reports through November 1, 1993, and the six psychiatrists' reports. We do not attribute knowledge of the November 22, 1993, psychologist's report to any of the Appellants-psychiatrists, because Plaintiff has presented no evidence that any of them saw it until after Wade's death, nor has she alleged that not having seen that report constitutes deliberate indifference. We also attribute to all the Appellants-psychiatrists the knowledge that liquid medications reduce the likelihood of hoarding medicine, and thus the risk of suicide.
 
 
 22
 However, Plaintiff has presented no evidence to evaluate the comparative risks of pill-line distribution and liquid distribution. She has not presented evidence that pill lines are generally less effective at preventing hoarding, or that this is true at SPSM in particular. Nor has she presented evidence that any of the Appellants-psychiatrists knew that the pill line was not effective at preventing hoarding of medication. She has also failed to present evidence that the SPSM policy that liquid medications were only available to prisoners in the prison hospital, not in the pill line, was implemented by the Appellants-psychiatrists.
 
 
 23
 What we are left with is this: The Appellants knew that Wade had attempted to commit suicide at WCJ by hoarding pills; that he had suicidal thoughts at times; that he was afraid he might kill himself, but doubted that he had the determination to do so; and that he claimed the medication was helping. The Appellants' evaluations showed a modest improvement in Wade's condition, and the doctors twice adjusted his medication to improve his condition. There is nothing to suggest that the doctors were failing to treat Wade or doing less than their training indicated was necessary. Plaintiff alleges no conduct which, absent knowledge of Wade's ultimate suicide, would conceivably constitute indifference to Wade's condition. Indeed, the doctors recognized the possibility of suicide and prescribed Wade's medication knowing that it would be dispensed, one dose at a time, under the supervision of a nurse who would watch while he took it to prevent hoarding. The only thing Plaintiff can suggest that Defendants might have done otherwise is to give Wade liquid medication instead of pills dispensed under a nurse's supervision. She argues, in essence, that this is such a small, easy change that the only conceivable reason for not making it is the doctors' deliberate indifference. In fact, Plaintiff's counsel tried mightily to advance a products-liability analogy at oral argument. This is not a products-liability case, and the standard is not whether there is something easy that the doctors, with the benefit of hindsight, could have done. It is whether they "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994) (emphasis added). To make this case, Plaintiff would need to show that the doctors actually knew that dispensing Sinequan tablets in a pill line constituted an excessive risk to Wade's health or safety. We hold that as a matter of law, Plaintiff has not done this. She has not presented any evidence that the doctors knew that the pill line was excessively risky to Wade's safety, and therefore has "fail[ed] to make a showing sufficient to establish the existence of an element essential to [her] case, . . . on which [she] will bear the burden of proofat trial." Celotex, 477 U.S. at 322. Therefore, the doctors are entitled to qualified immunity.
 
 III
 
 24
 Defendants-Appellants Mehra, Cabrera, and Rodriguez are entitled to qualified immunity. Additionally, Plaintiff failed to state a claim of deliberate indifference against Dr. Mehra. Accordingly, the judgment of the district court is REVERSED. The federal claims against the Defendants-Appellants are dismissed, and the case is remanded to the district court with instructions to dismiss the supplemental state claims.
 
 
 
 Notes
 
 
 [1]
 Mehra's initials are "K.N." Williams's complaint misstated Mehra's name, as reflected in the caption.
 
 
 [2]
 The panel majority identified the right at issue as Wade's right "to receive necessary psychiatric care," 135 F.3d at 1112, while the complaint alleged that Wade's right "to adequate medical care" was violated. Both of these formulations are too general to apply as legal standards--little better than "cruel and unusual punishment." Indeed, simple medical malpractice would meet the standard of failure to give "adequate" or "necessary" care. The Supreme Court's cases on medical care of prisoners make it clear that the right is properly understood as the right not to have one's serious medical needs treated with deliberate indifference.
 
 
 CONCURRING IN PART, DISSENTING IN PART
 
 25
 KEITH, Circuit Judge, concurring in part, dissenting in part.
 
 
 26
 I continue to believe that the course of treatment adopted by Defendants Cabrera and Rodriguez constituted an obvious disregard for Anthony Wade's serious medical needs. Consequently, I must respectfully dissent from the portion of my colleagues' opinion which finds that Defendants Cabrera and Rodriguez are entitled to qualified immunity. I concur, however, in the disposition as it relates to Defendant Mehra.
 
 1. Jurisdiction
 
 27
 On the issue of jurisdiction, I agree with the majority that the issue presented in this matter turns on questions of law, not of fact, thereby entitling us to jurisdiction over this appeal. See Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985); Sanderfer v. Nichols, 62 F.3d 151, 153 (6th Cir. 1995). The pieces of information of which Drs. Mehra, Cabrera and Rodriguez had actual knowledge are undisputed. Rather the question is whether, in light of that knowledge, their conduct and actions, or lack thereof, constituted, as a matter of law, deliberate indifference for the serious medical needs of Anthony Wade. Accordingly, jurisdiction over Defendants' appeals is proper. See Dickerson v. McClellan, 101 F.3d 1151, 1157 (6th Cir. 1996) ("[W]e may exercise jurisdiction over the officers' appeal [challenging the denial of the officers' motion for summary judgment on the basis of qualified immunity] to the extent it raises questions of law. Since the facts regarding whether the officers violated Dickerson's Fourth Amendment rights by failing to knock and announce are undisputed, our jurisdiction is clear.").
 
 2. Qualified Immunity
 
 28
 The first step in analyzing qualified immunity claims is to determine whether a constitutional violation has occurred. Dickerson, 101 F.3d at 1157-58. As part of that inquiry, the majority has formulated the right at issue as Wade's right not to have his serious medical needs treated with deliberate indifference, and I certainly do not disagree with this characterization. The en banc majority, however, proceeds to submit that the panel, by defining the right at issue as Wade's right to receive necessary psychiatric care, Williams v. Mehra, 135 F.3d 1105, 1112, reh'g en banc granted, 144 F.3d 428 (6th Cir. 1998), formulated the right at issue too generally. Although the panel did, at the outset, identify the right at issue as Wade's right to receive necessary psychiatric care, the panel, shortly thereafter, also went on to state that "[t]his is a case of whether the alleged failure of psychiatrists, who were sufficiently trained to provide necessary treatment to decedent's serious psychiatric needs (the risk of suicide), consciously disregarded those needs in violation of the Eighth Amendment." Id. In my opinion, the panel's characterization of the right is sufficiently analogous to the majority's formulation of the right at issue, such that the panel reviewed the proper right at issue, namely whether the Wade's serious medical needs were treated with deliberate indifference. Thus, I disagree that the panel misidentified Wade's right.
 
 
 29
 After the right at issue has been identified in a specific and particularized manner, the qualified immunity analysis requiresPlaintiff to show that Defendants were deliberately indifferent to decedent's serious medical needs. See generally Dickerson, 101 F.3d at 1157-58 (outlining the qualified immunity analysis); Sanderfer, 62 F.3d at 153-54 (discussing the qualified immunity analysis in the context of a deliberate indifference claim). In order to be held liable for deliberate indifference, a prison official must know of and disregard an excessive risk to an inmate's health. Farmer v. Brennan, 511 U.S. 825, 837-38, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837, 114 S.Ct. at 1979. However, a claimant is not necessarily required to prove that the prison official had actual knowledge of the substantial risk; rather, one may conclude that a prison official knew of a severe risk from the very fact that the risk was obvious. Id. at 842, 114 S.Ct. at 1981 (citations omitted).
 
 
 30
 Thus, to survive summary judgment on the grounds of qualified immunity, Plaintiff's burden is simply to allege facts which, if proven true, would demonstrate that Drs. Cabrera and Rodriguez knew of a substantial or obvious risk of serious harm to decedent Wade. The record is replete with facts which support a finding, as a matter of law, that Defendants had knowledge of an obvious and severe risk of harm. Even the en banc majority agrees that Drs. Cabrera and Rodriguez should be attributed with knowledge of the PSI, the PRF, the nurse's intake report, the five psychologists' reports through November 1, 1993, and the six psychiatrists' reports. These items sufficiently demonstrate that Wade: (1) attempted suicide several times, including most recently by hoarding pills; (2) continued to contemplate suicide after the most recent attempt; (3) was suffering from severe depression; and (4) had a suicide plan.
 
 
 31
 On the basis of the foregoing information, I conclude that the substantial risk of Wade's suicide is obvious, and that Drs. Cabrera and Rodriguez should be deemed to have had knowledge of a severe risk of serious harm to Wade. Despite this knowledge, they failed to act - they failed to alter the course of treatment from pill medication to liquid medication to eliminate the possibility of hoarding. Failure to act in the face of knowledge of an obvious and substantial risk of severe harm is the very essence of deliberate indifference. See id. Accordingly, I conclude that Drs. Cabrera and Rodriguez were deliberately indifferent toward Wade's serious medical needs, and should not be entitled to qualified immunity.
 
 
 32
 To the contrary, the majority emphasizes Plaintiff's failure to present evidence regarding: (1) the comparative risks of pill-line distribution and liquid distribution; (2) the ineffectiveness of pill-lines in preventing hoarding, either generally or specifically at SPSM; and (3) whether Defendants had actual knowledge that the pill line was ineffective in preventing hoarding. Presumably, the argument is that this information would have strengthened Plaintiff's position that the doctors knew of a substantial risk of harm. However, it is clear that deliberate indifference "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Id. at 835, 114 S.Ct. at 1978. "[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Id. at 842, 114 S.Ct. at 1981.
 
 
 33
 In finding that Plaintiff's failure to produce the foregoing evidence is fatal, I believe the majority is dangerously close to requiring that Plaintiff demonstrate that Defendants had "knowledge that harm will result." Requiring Plaintiff to allege that pill lines are ineffective or that the doctors knew that the pill line was ineffective in preventing hoarding, essentially forcesPlaintiff to establish that, by persisting in their current course of treatment, that Drs. Cabrera and Rodriguez knew Wade's suicide was imminent. This, in my opinion, puts Plaintiff to a heightened burden unintended by the dictates of Farmer. Plaintiff is not required to show that the doctors knew that the course of treatment would result in Wade's suicide. Rather, Plaintiff's sole burden is to demonstrate that Defendants knew of a substantial or obvious risk to Wade's serious medical needs yet acted with deliberate indifference, which, I conclude, is satisfactorily established by the allegations Plaintiff has set forth.
 
 
 34
 The majority further emphasizes that Defendants were actively treating Wade; in the majority's opinion, this forecloses a finding that the doctors were indifferent to the decedent's medical condition. I respectfully disagree with the suggestion that simply because an inmate or detainee receives some form of treatment, there is necessarily an absence of deliberate indifference. Even where some form of treatment has been administered, a doctor may have knowledge of an additional, substantial risk of harm, such that a failure to act or to amend the current course of treatment would constitute deliberate indifference. Cf. Estelle v. Gamble, 429 U.S. 97, 110, 97 S.Ct. 285, 294, 50 L.Ed.2d 251 (1976) (Stevens, J., dissenting) ("[I]t is surely not inconceivable that an overworked, undermanned medical staff in a crowded prison is following the expedient course of routinely prescribing nothing more than pain killers when a thorough diagnosis would disclose an obvious need for remedial [medical] treatment.").
 
 
 35
 On the basis of the foregoing, I respectfully dissent from the majority's determination that Plaintiff failed to state a claim of deliberate indifference against Drs. Cabrera and Rodriguez. Consequently, I would affirm the district court's judgment as to Drs. Cabrera and Rodriguez, but reverse and remand for an order of dismissal as to Dr. Mehra.
 
 DISSENTING IN PART, CONCURRING IN PART
 
 36
 MERRITT, Circuit Judge, dissenting in part and concurring in part.
 
 
 37
 In Johnson v. Jones, 515 U.S. 304, 319-20 (1995), Justice Breyer, writing for a unanimous Court, said, "we hold that a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the trial record sets forth a 'genuine' issue of fact for trial." That -- a summary judgment order that issues of fact exists -- is exactly what happened in the court below in the instant case. The District Court concluded that there was a genuine issue of material fact for trial on the issue of qualified immunity and declined to grant to the defendants qualified immunity immediately.
 
 
 38
 Justice Breyer's opinion gives a number of reasons for its holding that the courts of appeals do not have appellate jurisdiction over cases raising questions of qualified immunity when there is a genuine issue of material fact on that issue, for example:
 
 
 39
 [Q]uestions about whether or not a record demonstrates a "genuine" issue of fact for trial, if appealable, can consume inordinate amounts of appellate time. Many constitutional tort cases, unlike the simple "we didn't do it" case before us, involve factual controversies about, for example, intent - controversies that, before trial, may seem nebulous. To resolve those controversies - to determine whether there is or is not a triable issue of fact about such a matter - may require reading a vast pretrial record, with numerous conflicting affidavits, depositions, and other discovery materials.
 
 
 40
 Id. at 316.
 
 
 41
 That is exactly the case in the appeal before us. There is a large record of facts that this court must comb through in order to determine the factual merits of the qualified immunity issue. In the panel decision in this case, the majority opinion andJudge Boggs' dissenting opinion spend most of the 35 pages of opinions arguing over the facts. The facts are complex and detailed. There are no stipulations of facts by the parties and the parties do not agree as to what the facts are. Thus it seems to me that under the authority of Johnson v. Jones this case should be dismissed for lack of appellate jurisdiction.
 
 
 42
 The Court tries to get around the obvious problem of appellate jurisdiction by two little sleight-of-hand tricks. First, the court says that "plaintiff's facts [were] admitted by defendants for purposes of this appeal," thereby attempting to eliminate any factual issue by asserting that the defendants have conceded or in effect stipulated the facts for purposes of arguing the "deliberate indifference" legal issue on which qualified immunity depends. The second trick used by the court is simply to find various facts against the plaintiff. For example, the court says: "To make this case, plaintiff would need to show that the doctors actually knew that dispensing Sinequan tablets in a pill line constituted an excessive risk to Wade's health or safety. We hold that as a matter of law, plaintiff has not done this." Thus the court says that as a matter of fact-finding the doctors did not have the requisite state of mind to meet the standard of deliberate indifference because they did not have the requisite knowledge. Plaintiff contends that the facts when taken together circumstantially prove that the doctors knew the necessary facts and thus had the requisite state of mind. Thus the first trick is to assume anyway the facts and the second trick the court employs is simply to find the facts against the plaintiff.
 
 
 43
 This is not what the Supreme Court had in mind when it decided Johnson v. Jones, supra, and admonished federal appellate courts not to get involved in interlocutory appeals when the district court has found a genuine issue of fact concerning appellate jurisdiction.
 
 
 44
 Contrary to the proposition stated in the Court's opinion that "plaintiff's facts [were] admitted by defendants for purposes of this appeal," there is no such statement to be found anywhere in the briefs or record that would indicate that defendant-appellants are accepting all of the facts asserted by plaintiff. I find nothing in the record that would support the view that defendants are admitting any contested facts for purposes of appeal, and the Court's opinion does not cite anything anywhere in the record for this proposition. As stated above, in the panel decision in the case, the majority opinion and Judge Boggs' dissenting opinion spend most of their lengthy discussion arguing over the facts. Moreover, in defendants' en banc brief, the defendants repeatedly make such statements as "contrary to the majority [panel] opinion, uncontroverted evidence establishes" - indicating that defendants do not treat the facts as uncontroverted for purposes of this interlocutory appeal. The Court's opinion seems simply to accept defendants' version of the facts and then to label these facts admitted for purposes of appeal.
 
 
 45
 We should not pretend that the facts are not in dispute or that the parties have somehow stipulated the facts for purposes of appeal. And we should not go around finding facts on appeal before the District court has made findings of facts.
 
 
 46
 Therefore, the case is governed by Johnson v. Jones, 515 U.S. 304 (1995), holding that the courts of appeals have no jurisdiction to adjudicate qualified immunity interlocutory appeals of "a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a genuine issue of fact." 515 U.S. at 320. The appeal in this case should be dismissed because the facts on which the qualified immunity defense rests are in dispute, as the District Court concluded in the court below.
 
 
 47
 I should add, however, that if we are going to assume away the factual disputeor decide the factual dispute on appeal on the pretrial record before us, I do not disagree with Judge Boggs that on the facts now before us, the doctors should win. Assuming that at trial the facts will remain as they seem now on appeal, I do not disagree with the outcome reached in Judge Boggs' opinion. I agree that on balance the facts do not appear to prove deliberate indifference. Although I do not agree that we should reach the merits of the factual issues present in the case, if we are going to do so despite the law established in Johnson v. Jones, I agree with the outcome reached in Judge Boggs' opinion for the court.
 
 
 48
 So perhaps no great injustice has been done by cutting the case off at the pass now, but it is clear to me that the law of appellate jurisdiction over interlocutory appeals in qualified immunity cases, as set out in Johnson v. Jones, has not been properly applied by the Court.