Craig WRUBEL; Brenda Wrubel, individually and as Next Friend of Ryan Wrubel, a minor; Ryan Wrubel, a minor, Plaintiffs–Appellees,

v.

Michael J. BOUCHARD, Oakland County Sheriff; et al., Defendants,

Jane Boudreau; Sergeant, Oakland County Sheriff; Gary Miller, Sergeant, Oakland County Sheriff's Department; William Harvey, Sergeant, Defendants–Appellants.

No. 02–1730.

United States Court of Appeals, Sixth Circuit.

April 16, 2003.

Before: MARTIN, Chief Circuit Judge; KENNEDY and DAUGHTREY, Circuit Judges.

KENNEDY, Circuit Judge.

Plaintiffs–Appellees, Craig, Brenda and Ryan Wrubel, brought suit claiming false arrest and false imprisonment in violation of 42 U.S.C. § 1983. Defendant–Appellants, Jane Boudreau, Gary Miller and William Harvey, appeal from the district court's denial of Defendants' motion for summary judgment based on qualified immunity and partial grant of summary judgment for Plaintiffs on the question of whether a reasonable police officer could have believed that there was probable cause for arrest.

## I.

The following facts are undisputed, except where specifically indicated. On September 6, 1999, Craig Wrubel and his son, Ryan, were playing golf at the Twin Lakes Golf Course in Oakland County, Michigan. They teed off at approximately 4:30 p.m. When he signed in, Wrubel listed his name as "Rubel." Nicole Picklo, a 15 year-old cashier at the Twin Lakes pro shop, handled the transaction.

The Wrubels' golf game was interrupted by heavy rain. They sought shelter beneath an awning in front of the Turn Grill, a concession stand adjacent to the ninth green. Four other men sought shelter with them. After approximately one half-hour to forty-five minutes, Jared Zalewski, the manager of the pro shop, informed the men that they would have to clear the course due to the weather. Wrubel asked Zalewski how to obtain a rain check, and the Wrubels returned to the clubhouse in their golf cart.

Wrubel and his son returned to the pro shop to obtain their raincheck from Picklo. At that time, Wrubel corrected the spelling of his name. The raincheck was stamped 6:47 p.m. Wrubel and his son left the clubhouse and headed to their truck, where they stored their clubs and changed into their street shoes.

Within the next few minutes, Picklo received a call from Kelly Bardelline, a Twin Lakes employee who worked at the Turn Grill. Bardelline told Picklo she had been raped and asked for help. Picklo immediately told Zalewski, who was in the pro shop with her. Zalewski instructed Picklo to call 911, while he and two other employees went to help Bardelline. Picklo's call

to 911 was logged at 6:55 p.m., eight minutes after the time stamped on Wrubel's raincheck.

Oakland County Deputy Sheriff Sherry Locher arrived at Twin Lakes at 7:11 p.m. Bardelline told Deputy Locher that earlier in the afternoon, the rapist had come by the Turn Grill to ask how to get to the clubhouse. When the rapist first approached her, there were about six men hanging out in the Grill area, but Bardelline did not feel they were with the rapist. Bardelline said that the six men were asked to leave the course by one of the Twin Lakes employees. About ten minutes later, the rapist returned, entered the Grill through the back door, and raped her. Bardelline described him as medium build, dark-complected, possibly Chaldean, with dark hair and facial hair, wearing a red and blue or black striped polo-style shirt and dark shorts. However, Bardelline mentioned several times to the officers that day that she did not get a good look at the rapist.

Deputy Clark, another officer on the scene, questioned Picklo, the cashier. After Deputy Clark shared the description given by Bardelline, Picklo said that she remembered a golfer who fit that description. She identified Wrubel from pro shop paperwork, said he was wearing a dark red shirt, and described a scar on one cheek, pockmarked cheeks, a mustache and beard, missing lower front teeth and a darkened front tooth. According to Deputy Clark's narrative report, Picklo stated that Wrubel was with a child, whom he left alone for almost a half-hour prior to receiving the raincheck. However, in a written statement provided to the officers that evening, Picklo stated that Wrubel left his son alone in the pro shop only after he got his raincheck, and Picklo asserted in her deposition that this was the information

she provided to Deputy Clark on the scene.

Another employee, Jason Smith, told Deputy Clark that he saw a man matching Wrubel's description drive out of the golf course at high speed just as he was returning from the Turn Grill after helping Bardelline.

Deputy Locher took Bardelline to the hospital, where a rape kit was prepared. At the hospital, Bardelline gave essentially the same description of the rapist to a second officer, Sergeant Jane Boudreau— white male, dark-complected, possibly Chaldean, with facial hair, in a red with blue or black-striped shirt.

The following day, Bardelline and Picklo made composite sketches at the police station. The composites bore very little resemblance to one another. Nonetheless, the police chose to distribute Picklo's composite, which strongly resembled Wrubel, because Bardelline said she did not get a good look at the rapist. The police distributed the Picklo composite to local news agencies, along with Wrubel's name— spelled "Rubel"—and the fact that he was with a small child and drove a truck.

On the evening of September 7, Wrubel returned home from his golf league between 10:00 and 11:00 p.m. His wife, Brenda, who had seen the evening news, informed him that he was a suspect in a rape. Wrubel himself saw the story about the rape, including Picklo's composite, on the late news. Wrubel, his wife, his sister, and his son, Ryan, immediately went to the Oakland County Sheriff's Department to clear things up. The police questioned Wrubel until 3 a.m. Wrubel maintained his innocence at all times. When the police told Wrubel that the rape occurred between 6:30 and 6:50 p.m., Wrubel gave them the raincheck stamped 6:47 p.m. to prove his innocence.

The police also questioned Wrubel's son, Ryan. After extensive questioning, the police released Ryan back to his mother, but later they took him back in for more questioning. At that point, under further interrogation, Ryan equivocated, stating that maybe his father left him for about ten minutes to smoke a cigarette, and maybe the cart had been moved.

The police arrested Wrubel without a warrant at 3:25 a.m. on September 8, 1999. That afternoon, Bardelline failed to identify him in a line-up. The next day, September 9, the police obtained a search warrant for a DNA sample from Wrubel. They took samples of his hair and blood. Wrubel was released that day. The DNA test later excluded Wrubel as the rapist. No charges were brought against him.

The district court denied Defendants' motion for summary judgment based on qualified immunity and the existence of probable cause and later granted Plaintiffs' own motion for summary judgment, finding that given the undisputed facts, no reasonable jury could find that the officers had probable cause to arrest Wrubel.

## II.

We review a district court's grant of summary judgment *de novo*, applying the standards established under Federal Rule of Civil Procedure 56(c). Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). All inferences must be drawn in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The question of whether a set of historical facts amounts to probable cause is a mixed question of law and fact appropriate for *de novo* appellate review. *Ornelas v. United States*, 517 U.S. 690, 697–99, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir.1995).

Probable cause exists if there are "facts and circumstances within the officers' knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979). Probable cause must be evaluated based on "an examination of all facts and circumstances *within an officer's knowledge at the time of an arrest.*" *Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir.1999).

We also review the denial of a qualified immunity defense *de novo*. *Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir.1999). Whether an officer is protected by qualified immunity depends on "the objective legal reasonableness of the action ... assessed in light of the legal rules that were clearly established at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The Supreme Court has stated that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

This Circuit has established a "tripartite procedure" for evaluating the applicability of the qualified immunity defense:

First, we determine whether a constitutional violation has occurred; second, we determine whether the right that was violated was a clearly established right

of which a reasonable person would have known; finally, we determine whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonably in light of the clearly established constitutional rights.

*Williams v. Mehra,* 186 F.3d 685, 691 (6th Cir.1999).

In practice, the first two prongs of this analysis operate at a relatively high level of abstraction. For example, this Court has held that the right to be free from arrest without a warrant and without probable cause is clearly established. *Gardenhire v. Schubert,* 205 F.3d 303, 313 (6th Cir.2000).

The key issue for qualified immunity in this case in whether, given the information known to the officers at the time of arrest, a reasonable officer could have believed that the arrest was based on probable cause. *Avery v. King,* 110 F.3d 12, 14 (6th Cir.1997). As long as their determination of probable cause was objectively reasonable, Defendants are entitled to immunity, even if their determination was mistaken. *Anderson,* 483 U.S. at 641.

Based on uncontroverted facts in the record, the officers had the following information at the time of arrest: that Wrubel had been at the golf course at the time the rape occurred; that Wrubel was in the area of the Turn Grill at the time Bardelline said the rapist first approached her there; that Picklo identified Wrubel as the only person at the course that day who matched Bardelline's description; that Picklo saw Wrubel leave the clubhouse for a period of time without his son, Ryan, after obtaining his raincheck;[1] that, after extensive interrogation, Ryan equivocated as to whether his father ever left him alone in the clubhouse; that another Twin Lakes employee, Jason Smith, saw a truck matching the description of Wrubel's truck leaving the golf course at high speed shortly after the rape was reported.

Although these facts certainly support a finding of probable cause. "an officer cannot look only at the evidence of guilt while ignoring all exculpatory evidence. Rather, the officer must consider the totality of the circumstances, recognizing both the inculpatory and exculpatory evidence, before determining if he has probable cause to make an arrest." *Gardenhire v. Schubert,* 205 F.3d 303, 318 (6th Cir.2000). The district court found that the balance of the facts known to Defendants at the time of arrest were exculpatory, and therefore a finding of probable cause was inherently unreasonable. Specifically, the district court relied on the following facts: (1) that Bardelline stated that she did not think the rapist had been part of the group of men seeking shelter near the Turn Grill during the rainstorm, (2) that Bardelline

---

1. There is a disputed factual issue as to whether the officers believed that Picklo saw Wrubel leave his son alone before or after obtaining the raincheck. According to Deputy Clark's narrative report, Picklo stated that Wrubel was with a child, who he left alone for almost a half-hour prior to receiving the raincheck. However, in a written statement provided to the officers that evening, Picklo stated that Wrubel left his son alone in the pro shop only after he got his raincheck, and Picklo asserted in her deposition that this was the information she provided to Deputy Clark

on the scene. If Wrubel left his son alone prior to 6:47 p.m., a reasonable officer might have believed that Wrubel raped Bardelline before obtaining the raincheck. For the purposes of Plaintiff's summary judgment motion, this fact is relevant. However, for the purposes of evaluating Defendants' qualified immunity defense, we are obliged to construe all facts in favor of the Plaintiff and thus assume that the officers knew that Picklo's statement indicated that Wrubel left his son alone only after obtaining his raincheck.

did not identify Wrubel's distinctive scar, missing teeth, and pock-marked skin, and (3) that there were only eight minutes between the time stamped on the raincheck and the time the rape was reported.

These facts are not sufficient to make a determination of probable cause unreasonable. First, Bardelline's statement that the rapist approached her while six men where seeking shelter under the awning of the Turn Grill would not have necessarily indicated that Wrubel is innocent. Bardelline had not specifically seen Wrubel under the awning and thus did not eliminate him as the man who approached her and later raped her. The police did not have to credit Wrubel's statement that he remained under the awning at all times with the other men. *Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir.1988) (holding that officers are "under no obligation to give any credence to a suspect's story."). Other than Wrubel's own statement. Defendants had no reason at the time of arrest to exclude Wrubel as the man who approached Bardelline to ask for directions to the clubhouse, or even to believe that he was one of the six men under the awning. According to the facts in the record, Jared Zalewski told police on the evening of the rape that he did not remember speaking with Wrubel under the awning. In fact, the timing of the rapist's initial encounter with Bardelline establishes that Wrubel was admittedly in the same vicinity as the actual rapist and might have suggested a connection between Wrubel and the rape in a reasonable officer's mind.

Second, although the fact that Bardelline's description did not identify all of Wrubel's distinctive facial features would create some doubt in any reasonable person's mind as to whether Wrubel was in fact the rapist, this fact does not make it unreasonable to conclude that Wrubel was the rapist. There is nothing prima facie

inconsistent between Bardelline's description and Wrubel's appearance. In fact, Bardelline's admittedly generic description is entirely consistent with Wrubel's physical appearance. Bardelline repeatedly told the officers that she did not get a good look at the rapist; this could have explained the fact that she did not notice his scar, pock-marked cheeks, and irregular teeth. In light of the totality of the circumstances—particularly the fact that Picklo identified Wrubel as the only person she saw on the course that day who matched Bardelline's description—the failure to notice certain distinctive features is not sufficiently exculpatory to make probable cause unreasonable.

Third, the district court decided that it would be impossible for a reasonable officer to have concluded that Wrubel raped Bardelline in the eight minutes between getting his raincheck at the pro shop and time Picklo made the 911 call. The parties stipulate that it would have taken three to five minutes to get to the Turn Grill from the pro shop. However, there is no evidence in the record stating what the officers knew about approximately how long the rape lasted or when precisely the rape occurred. In light of the other evidence pointing to Wrubel as the rapist, it is inappropriate to conclude as a matter of law that a reasonable officer had to believe both that the time of the raincheck that Wrubel presented was accurate and that it was physically impossible for anyone to get from the clubhouse to the Turn Grill and rape Bardelline in eight minutes.

Because we are prepared to reverse the district court's judgment denying Defendants' motion for summary judgment based on qualified immunity, it logically follows that we also reverse the district court's determination that Wrubel is entitled to summary judgment on the question of probable cause. If a reasonable officer

could find there was probable cause viewing the facts in a light most favorable to the Plaintiffs, certainly a reasonable jury could also so find, especially when viewing the facts in a light most favorable to Defendants.

For the foregoing reasons, we REVERSE the district court's order granting summary judgment for Plaintiffs, REVERSE the district court's order denying summary judgment based on qualified immunity for Defendants, and REMAND to the district court for proceedings consistent with this opinion.