NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0061n.06

No. 20-1700

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| LEON DESEAN LIPPETT, | ) | **FILED** |
| | ) | Feb 02, 2022 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | |
| | ) | |
| CORIZON HEALTH, INC., a foreign Corporation, | ) | ON APPEAL FROM THE |
| DIANE HERRING; SHARON DRAVELLING; | ) | UNITED STATES DISTRICT |
| DOCTOR BETH CARTER; OFFICER THOMAS | ) | COURT FOR THE EASTERN |
| JORDAN; MICHELLE PIECUCH, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendants, | ) | |
| | ) | |
| LISA ADRAY, | ) | |
| | ) | |
| Defendant-Appellant | ) | |

Before: SUHRHEINRICH, STRANCH, and MURPHY, Circuit Judges.

SUHRHEINRICH, Circuit Judge. Leon Lippett developed a severe foot infection while in the custody of the Michigan Department of Corrections ("MDOC"). He sued Corizon Health, Inc. (MDOC's health services contractor) and one of its physicians, as well as several MDOC nurses and one corrections officer, claiming they violated the Eighth Amendment and were grossly negligent under Michigan law. The district court granted summary judgment (based on qualified immunity and governmental immunity under Michigan law) for all defendants[1] except one—acting

---

[1] The court also granted summary judgment, by Lippett's consent, to Corizon.

Nurse Supervisor Lisa Adray, who now brings this interlocutory appeal. Because Adray makes no arguments that are reviewable in this posture, we dismiss her appeal.

## I.

We recount the relevant facts as determined by the district court, keeping in mind that we generally may not question them now. *See Gillispie v. Miami Township*, 18 F.4th 909, 912 (6th Cir. 2021).

Lippett's foot became infected on June 25, 2017. On June 26, he filed a health care request form—called a "kite," in prison jargon—which stated: "I have dealt with athlete's foot for a longtime [sic]. I have had several different types of ointments. My foot has developed a severe infection, which has my foot in much pain. I need immediate attention." Early the next morning, after reviewing his kite, Nurse Diane Herring booked an appointment in the prison's health care clinic for the morning of June 28.

Lippett's infection apparently worsened thereafter, as his foot became more swollen and painful. He attempted to obtain treatment at the clinic, without an appointment, several times on June 27—all of which (except one, during which Lippett was seen by nurses and given Tylenol) failed for reasons unrelated to Adray. *Lippett v. Corizon Health, Inc.*, No. 18-cv-11175, 2020 WL 532399, at *2–3 (E.D. Mich. Feb. 3, 2020), *rev'd on reh'g in part on other grounds*, 2020 WL 3425044 (June 23, 2020). Those attempted visits are not at issue here.

Around 9:30 a.m. on June 28, Lippett reported to the clinic for the appointment that Nurse Herring scheduled; before entering the clinic, however, Officer Jordan (who was posted outside the clinic) told Lippett that his appointment was canceled and would be rescheduled. Lippett did not know who canceled his appointment, nor did Jordan. Officer Robison (another corrections officer on duty at the time) later testified, however, that Nurse Adray canceled the appointment.

The record is unclear why Adray canceled the appointment, but that doesn't matter for this appeal; the district court found that she did not subjectively perceive Lippett's medical needs then, so she was entitled to qualified immunity at that point. *Id.* at *13.

Around 12:30 p.m. on June 28, Lippett spoke with Officer Robison back at his housing unit; Lippett showed her his foot and described his pain. Noticing that the foot was swollen, Robison called the clinic to see if there was "something [she] could do." Robison recalled that Nurse Adray answered the phone and responded that Lippett "would be seen when a nurse is available," which Robison then noted in the prison's logbook. After Lippett pressed her, Robison called the clinic again a few minutes later, at 12:39 p.m., and recalled asking "is there any way that you guys could see him, [because] his foot appears to be swollen." As Robison noted in the logbook, Adray then responded that Lippett's "appointment will be rescheduled for another day." We don't know, on this record, why Adray said that, but again it doesn't matter—the district court found that Adray did not subjectively perceive Lippett's medical needs even then, so she was entitled to qualified immunity. *Id.*

From the district court's view, things changed a bit later. Around 2:15 p.m., Lippett attempted to visit the clinic again without an appointment or permission from a corrections officer, but he was turned away. The district court summarized that visit:

> Around 2:15 PM on June 28th, Lippett tried again to get attention from health care. (ECF No. 61-3, Lippett Dep., PgID 1882–83.) He limped to health care and told Officer Rushing about his problem, showed Officer Rushing his foot, and asked him for help. (*Id.* at PgID 1883.) Officer Rushing went inside, talked to a nurse, he could not remember which one but stated that his best guess was Nurse Adray, and the nurse told Officer Rushing that they did not have time to see Lippett. (ECF No. 61-3, Rushing Dep., PgID 2029.) Officer Rushing told Lippett they could not see him and Lippett went back to his unit. (*Id.*) Officer Rushing testified that health care was short staffed at the time, though he also testified that this interaction occurred in the morning of the 28th, not in the afternoon. (*Id.* at PgID 2028–29.)

Anthony Woods[,] [a fellow inmate at Lippett's prison,] was in health care services receiving treatment at some point on the 28th and overheard "the head nurse" telling another nurse that Lippett was "faking" and instructing the other nurse to send Lippett back. (ECF No. 61-3, Woods Dep., PgID 1961.) The other nurse said that she told the unit staff to send Lippett over and said that she could not send him back, but the "head nurse" insisted. (*Id.*) Woods could not remember the exact day on which this occurred, or the names of the nurses involved, but described the time of day as the "evening" and said that Lippett was sent to the hospital the next day. (*Id.* at PgID 1961–65.) Therefore, this conversation occurred sometime on June 28th. Lippett believes that Nurse Adray was the "head nurse" Woods overheard saying that Lippett was faking. (*See* ECF No. 60, Response to MDOC MSJ, PgID 1051.) Nurse Adray was the supervising nurse at the time, and she worked until 3:46 on June 28th. (ECF No. 45-14, Adray Timesheet, PgID 751.) Nurse Adray did not remember this incident and testified that the only interaction she had with Lippett was talking to him as he was waiting to see Dr. Carter on June 29th. (ECF No. 61-4, Adray Dep., PgID 2211–12.)

*Lippett*, 2020 WL 532399, at *4.

Although Lippett was ultimately treated by no later than 4:29 p.m. that day—by both Nurse Herring and the prison physician, Dr. Beth Carter—the district court denied qualified immunity to Adray. Based on inferences drawn from the summary judgment record, the court found that Lippett created a genuine factual dispute as to whether Adray was the nurse who denied him treatment at 2:15 p.m., and whether Adray did so knowing of his serious medical needs. It reasoned:

[I]f, as a jury could believe, it was Nurse Adray who turned Lippett away when he went to health care the third time on June 28th, around 2:15 PM, and if that was when Woods heard her say that Lippett was faking, she learned two more facts. (ECF No. 61-3, Lippett Dep., PgID 1882–83; ECF No. 61-3, Rushing Dep., PgID 2029.) First, she learned that another layperson thought that there was something wrong with Lippett's foot—Officer Rushing testified that he told the nurse with whom he spoke, who he guessed was Nurse Adray, that Lippett had "an issue." (*Id.*) Second, she learned that Lippett's symptoms were bad enough that he had come to health care without authorization. These facts increase the obviousness of the risk to the point where it is fair to conclude that she actually perceived the risk. *Farmer*, 511 U.S. at 842. Her comment, that Lippett was "faking," shows a callous disregard of that risk. (ECF No. 61-3, Woods Dep., PgID 1961.) Therefore, the allegation that Nurse Adray turned Lippett away from health care on the afternoon of the 28th constitutes deliberate indifference, which is a clearly established violation of Lippett's Eighth Amendment right to be free of cruel and unusual

-4-

> punishment. *See, Phillips*, 534 F.3d at 539–45; *Estelle*, 429 U.S. at 104. Nurse
> Adray is not entitled to qualified immunity on the Eighth Amendment claim against
> her, and the Court denies her request for summary judgment.

*Id.* at *14.

While the district court denied Adray qualified immunity as to Lippett's deliberate-indifference claim, it granted her governmental immunity under Michigan law as to Lippett's gross-negligence claim. *Id.* at *16. It later reversed that ruling on rehearing, however, after finding that it applied the wrong causation standard. *Lippett v. Corizon Health, Inc.*, 2020 WL 3425044, at *3–5 (E.D. Mich. June 23, 2020). Both Adray and Lippett appealed, but a motions panel dismissed Lippett's appeal for lack of jurisdiction. *Lippett v. Corizon Health, Inc.*, No. 20-1751, 2020 WL 8472484, at *2 (6th Cir. Dec. 30, 2020). We turn now to Adray's appeal, which takes aim at both Lippett's deliberate-indifference and gross-negligence claims. Our analysis for each begins and ends with jurisdiction.

## II.

Generally, orders denying summary judgment are not "final decisions" appealable under 28 U.S.C. § 1291, but that general rule does not apply to such orders denying qualified immunity. *Plumhoff v. Rickard*, 572 U.S. 765, 772 (2014). In those cases, we may review the denial of qualified immunity "to the extent that it turns on an issue of law." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Those issues of law are usually whether (1) "the facts and inferences as determined by the district court 'show a violation' of" a constitutional or statutory right, and (2) whether that right was clearly established. *Downard ex rel. Downard v. Martin*, 968 F.3d 594, 599 (6th Cir. 2020) (quoting *Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999) (en banc)); *see also Williams*, 186 F.3d at 689–90, 691–92.

But we may not review in this posture claims about "'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial." *Johnson v. Jones*, 515 U.S. 304, 313 (1995). According to Lippett, this appeal fits that mold. We agree.

Adray argues only that "Lippett has failed to produce any admissible evidence on which a reasonable juror could conclude that [she] was personally involved in the alleged decision to deny Lippett" health care. She claims that, if the district court had disregarded as inadmissible the testimony of Anthony Woods—the inmate who heard the "head nurse" say that "[Lippett] was faking, send him back"—"there would be no evidence [showing that] Adray had any involvement with Lippett's alleged denial of care." Maybe so, but that boils down to only a *Johnson*-type claim of evidence sufficiency—*i.e.*, that Lippett is unable to prove at trial that Adray was personally involved in his denial of care. We may not review that question in this posture. *Id.*

And Adray's counterargument changes nothing. She tries to disguise her factual argument as a "purely legal" one, insisting that the issue is only whether the district court erred in considering purportedly inadmissible evidence when denying summary judgment. But we have adhered to *Johnson*'s rule even where "the only factual dispute in th[e] case arises from the rankest type of inadmissible hearsay." *Ellis v. Washington County*, 198 F.3d 225, 229 (6th Cir. 1999). So *Johnson*'s rule applies here.

We note that, while there are other legal issues that Adray could have raised here, we have limited our analysis only to those that she has raised. For example, she does *not* argue that the district court's factual determinations fail to "'show a violation' of the deliberate indifference standard" as a matter of law, *Downard*, 968 F.3d at 599 (quoting *Williams*, 186 F.3d at 690), or that that violation was not clearly established, *Williams*, 186 F.3d at 690. Had she done so, we could have "ignore[d] [her] attempts to dispute the facts and nonetheless resolve[d] the legal

issue[s]." *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 611 (6th Cir. 2015) (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005)). However, because Adray did not, nor will we, and we thus do not reach those issues. Instead, we dismiss her appeal.

**III.**

Next up is Adray's challenge to the district court's denial of summary judgment as to Lippett's gross-negligence claim. Below, Adray asserted governmental immunity under Mich. Comp. L. § 691.1407 as to that claim, which the district court first granted, then denied on rehearing. *Lippett*, 2020 WL 3425044, at *3–5.

Adray does not argue that the denial of governmental immunity was error; rather, her argument is merits-based. She asserts that "the law in Michigan does not allow intentional acts to be the basis of a claim for gross negligence." Because Lippett based his gross-negligence claim "on the same conduct" supporting his deliberate-indifference claim, Adray argues, it "fail[s] as a matter of law." Adray does not explain what that has to do with governmental immunity,[2] so we must ask whether this claim is reviewable under the doctrine of pendant appellate jurisdiction.

It is not. Because we lack jurisdiction to consider Adray's arguments as to Lippett's deliberate-indifference claim, we necessarily lack pendant appellate jurisdiction to consider her appeal of Lippett's state-law claim. Pendant appellate jurisdiction extends to "issues that are not independently appealable when those issues are 'inextricably intertwined' with" an issue over which this court "*properly and independently has jurisdiction*." *Williams v. Maurer*, 9 F.4th 416, 428 (6th Cir. 2021) (quoting *Farm Lab. Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523,

---

[2] Had Adray argued here that she was wrongly denied governmental immunity, we would likely have jurisdiction to review that denial as an order that is *independently* appealable under Michigan law. *See Rudolph v. Babinec*, 939 F.3d 742, 753 (6th Cir. 2019) (per curiam); *Bennett v. Krakowski*, 671 F.3d 553, 560 (6th Cir. 2011); *Smith v. County of Lenawee*, 600 F.3d 686, 689–90 (6th Cir. 2010); *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 407–08 (6th Cir. 2007); *see also* Mich. Ct. R. 7.202(6)(a)(v) (defining a "final order" to include "an order denying a motion for summary [judgment] . . . based on a claim of governmental immunity").

549 (6th Cir. 2002)) (emphasis added). Even if the federal- and state-law issues here were inextricably intertwined (they're not),[3] we lack jurisdiction over the federal-law issue, as explained above. That precludes pendant appellate jurisdiction over any state-law issues that, like Adray's merits-based challenge to Lippett's gross-negligence claim, are not independently appealable.

## IV.

For those reasons, we dismiss Adray's appeal.

---

[3] Two issues are inextricably intertwined where resolution of one "*necessarily* resolves" the other. *Courtright v. City of Battle Creek*, 839 F.3d 513, 523 (6th Cir. 2016) (quoting *Mattox v. City of Forest Park*, 183 F.3d 515, 524 (6th Cir. 1999)). That plainly is not the case here. The first issue, whether Adray was entitled to qualified immunity for an alleged Eighth Amendment violation, in no way—let alone necessarily—resolves the second issue, whether Michigan law allows Lippett to simultaneously assert deliberate-indifference and gross-negligence claims.